PHYLLIS ABRAMS *et al.*, Plaintiffs-Appellees, v. THE CITY OF MATTOON, Defendant-Appellant.

Fourth District   No. 4—86—0099

Opinion filed October 14, 1986.

Richard F. Record, Jr., Gregory C. Ray, and Elizabeth Hunt Boyle, all of Craig & Craig, of Mattoon, for appellant.

Robert I. Auler, of Auler Law Offices, of Urbana, for appellees.

JUSTICE WEBBER delivered the opinion of the court:

Plaintiffs, husband and wife, filed suit against the city of Mattoon (city) for personal injuries to the wife and loss of consortium to the husband arising out of an automobile accident in which the vehicle driven by the wife was struck in the rear by a police squad car driven by an officer of the city. The circuit court of Coles County entered summary judgment for plaintiffs on the question of liability, reserving, however, the question of Phyllis Abrams' comparative negligence. The cause was then tried to a jury on that question and on the question of damages. The jury returned verdicts of $30,000 for Phyllis Abrams (Phyllis) and $1,500 for Tom Abrams (Tom) and found Phyllis to be 20% negligent. The trial court reduced the verdicts appropriately and entered judgments thereon. The city has appealed, and we reverse and remand for a new trial on all issues.

A variety of issues are raised by the city on appeal. In summary, these are: (1) error in entering summary judgment; (2) error in the admission of certain testimony relating to injury to Phyllis' eye; (3) whether a rule regarding expert testimony should be altered or abolished; (4) whether the verdicts were against the manifest weight of the evidence; (5) error in the admission of certain medical testimony; and (6) prejudicial closing argument by plaintiffs' counsel.

A brief synopsis of the evidence follows. On June 22, 1982, Phyllis was driving a pickup truck and had stopped at the intersection of

DeWitt Avenue and 19th Street in Mattoon. Each of these streets consisted of four lanes, two eastbound and two westbound on DeWitt, two northbound and two southbound on 19th. All directions of travel were controlled by stop signs. Broad white striping on the pavement indicated the stopping place for vehicular traffic and narrower white striping indicated pedestrian crosswalks. On the day of the accident Phyllis was eastbound on DeWitt in the curb lane and stopped at the broad white stripe preparatory to making a right turn onto 19th. She was aware that a police squad car was following her. She observed another vehicle southbound on 19th stopped north of the intersection. She began her right turn and then saw that the other vehicle started up and came through the intersection. She then stopped again to allow it to pass and was struck in the rear by the squad car driven by Lieutenant James Neason of the Mattoon police department.

Neason testified that as he approached the intersection he saw no traffic other than the Abrams' vehicle, which had started up and then abruptly stopped. As it did so, the squad car struck the rear of the pickup. Other evidence indicated that the impact caused a light bend in the push bumper of the squad car and a bend in the bumper of the pickup. Both parties got out of their vehicles and approached one another. Phyllis testified that Neason said to her that "it was his fault and for me to go to the hospital and get well and they'd take care of everything." She further testified that she was jerked quite a bit and hurt her neck, her stomach hit the steering wheel, and she hit her mouth on the top of the steering wheel. Her neck was sore, her head hurt, her mouth hurt, and her stomach hurt.

Both vehicles were removed to a car wash at the intersection by other officers summoned by Neason to the scene, and Phyllis was taken to the hospital by a friend who was called. At the hospital she was examined by Dr. Jemsek, a physician board certified in family medicine. In the emergency room she gave him a history of having been struck from behind and expressed complaint of a great deal of pain in her neck, back, and chest. Examination resulted in findings of tenderness in the cervical region and collarbone and near the left fifth rib. She was admitted to the hospital with an admitting diagnosis of traumatic cervical spine strain. Physical therapy was prescribed. X rays showed no evidence of fracture in the cervical spine, but did show some degenerative changes not the result of the accident. Over objection Dr. Jemsek was asked whether such changes can be aggravated by trauma. He answered, "Sometimes it aggravates it, sometimes it doesn't."

During her stay in the hospital Phyllis received treatment for

bronchitis and bowel irregularity in addition to the physical therapy. On at least three occasions she refused the physical therapy. She was discharged from the hospital on June 28, 1982, with a prescription for a muscle relaxant known as Flexiril. She was still having some discomfort in her neck and was instructed to return to the hospital for physical therapy twice a week for up to 12 treatments.

Phyllis continued to see Dr. Jemsek in his office with complaints of pain. He prescribed Naprosyn, an anti-inflammatory medication. Over objection he testified as to possible side effects of Flexiril and Naprosyn. Since she did not appear to be improving, he referred her to Dr. Harms, an orthopedic surgeon at Carle Clinic in Champaign.

Dr. Harms submitted a report to Dr. Jemsek in which he indicated that the patient should be approached with the suggestion that stress was causing her symptoms and exaggerating her discomfort. He found an exaggerated response to light touch over the entire spine, which was inconsistent with organic findings. He characterized her symptoms as "functional problems." Dr. Jemsek had treated her in 1974 for psychophysiological gastrointestinal disease. In his judgment she had probably had stress problems over a period of 20 years. Dr. Jemsek stated that he had examined her two days before trial on October 19, 1985, but had not seen her since November 17, 1982, prior to the former date.

Over objection Dr. Jemsek testified that Phyllis' injuries to her neck "could or might" be permanent, and over further objection testified that "well possibly" things like sleeping in an unusual position or air conditioning could cause spasms in the neck. He further testified that he did not have an opinion within a reasonable degree of medical certainty whether her complaints would persist after trial.

Phyllis testified that while in the hospital her vision became blurred, more so than before her admission. This occurred on the second or third day of her hospital stay, and at a time when she was not wearing contact lenses prescribed for her following cataract surgery earlier in the year. She also stated that she noticed her blurred vision between the time of the accident and her arrival at the emergency room, but she did not complain of it in the emergency room to Dr. Jemsek, who stated that he had no knowledge at any time of any injury to the eye. His examination of the eye in the emergency room disclosed no problems, although he did not administer a visual acuity test.

Considerable evidence was taken from Dr. James Faron, an optometrist practicing at Carle Clinic. In view of the position we have taken with regard to any potential eye injury, as explained below, that

testimony need not be recounted at length. Briefly recapitulated, it showed that he had fitted Phyllis with a contact lens following cataract surgery on her left eye in April 1982, approximately two months prior to the accident. Her vision was then 20/30 with the contact. She received a slightly stronger lens in May 1982 and again in June 1982. A third lens was dispensed on June 15, 1982, and with it her vision tested 20/30. She returned on July 12, 1982, with the same lens, at which time she tested 20/40. Dr. Faron stated that this was not a significant change.

She returned again on August 16, 1982, for a progress check which showed vision of 20/50. Over-refraction showed an increase in astigmatism, and, with this corrected, her vision was recorded at 20/30. This was the same as before the accident. Dr. Faron saw her on numerous occasions during 1983, 1984, and 1985. In June 1985 a stronger lens was indicated, which was dispensed, and her vision was again 20/30 with the contact. Vision tests did not indicate any decrease in corrected vision following the accident. According to Dr. Faron, Phyllis suffered from hyperopia, astigmatism, and presbyopia. These conditions will lead to a decrease in uncorrected vision over time.

Over objection Phyllis testified that at the time of trial she could see "less" with her left eye than she could before the accident and denied that her vision as corrected with the contact lens was as good after the accident as before.

The first issue concerns the propriety of a summary judgment entered by the trial court which found as a matter of law that plaintiffs were entitled to judgment on the question of the city's liability. This order was entered September 17, 1984, approximately 11 months prior to trial.

The fundamental principles governing summary judgment are so well known that further reiteration here would only serve to unduly lengthen this opinion. In summary it may be said that summary judgment is entered properly only if the pleadings, affidavits, and depositions on file at the time reveal that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. The relevant affidavits and depositions will be strictly construed against the moving party. *Murphy v. Urso* (1981), 88 Ill. 2d 444, 430 N.E.2d 1079.

As previously mentioned, the trial court entered the summary judgment on the question of the city's liability but reserved the question of Phyllis' comparative negligence for the jury. She now argues that since the jury found in her favor to the extent of 80%, any error

in entering the summary judgment was harmless. We do not agree.

■■ ■ The trial court may consider only the evidence on file at the time of ruling on summary judgment. Any error cannot be cured by a subsequent verdict. We find analogy in *McMillen v. Carlinville Area Hospital* (1983), 114 Ill. App. 3d 732, 450 N.E.2d 5. In that case this court held that a verdict in favor of a defendant cannot be used to support a directed verdict on a *res ipsa loquitur* count because the verdict was not in existence at the time the directed verdict was entered. As we have noted, the summary judgment in the instant case was entered almost one year before the general verdict. Moreover, plaintiffs' counsel in both opening and closing argument referred to the fact that the court had already found in their favor on the issue of liability. It is generally recognized that juries will look to the trial judge for any clue which might guide them and that trial judges seek to avoid any appearance of favoring one side or the other in order that the jury may not be influenced. Here it is patent that the jury knew that the court had ruled in favor of the plaintiffs without being told, much less understanding, on what basis. The error cannot be said to be harmless.

The motion for summary judgment was supported by two pages taken from the deposition of Neason. The pertinent portion is:

"Q. [By plaintiffs' counsel] All right. Tell me what happened on the day in question.

A. What day was that?

MR. AULER: June 22, 1982 at about 9:58 A.M.?

A. Okay. I was patrolling in my squad car just like I normally do every day, proceeding east on DeWitt Avenue, approaching the intersection of 19th & DeWitt when a black pickup truck was leaving the stop sign, and then stopped in front of me again, and we collided.

Q. Now what lane were you in?

A. In the outside lane.

Q. How many lanes of travel are available for use at that point?

A. Four lanes. Two for me, two for the westbound traffic.

Q. And you were in the one nearest the curb?

A. That is correct.

Q. Can you describe the other cars that were present at that time?

A. There weren't any that I saw, except one just about a minute and a half or two minutes after the collision, proceeding west.

Q. Is there normally parking along the curb at that point?

A. No."

The only other pertinent evidence of record at the date that the court entered summary judgment was the following statement contained in answers to interrogatories filed by the city on October 20, 1983:

"James D. Neason, eastbound in the right-hand lane on Dewitt Avenue and approaching the intersection of 19th Street with Dewitt Avenue, applied his brakes to stop at the stop sign at said intersection. James D. Neason observed the immediately preceding vehicle, that operated by Plaintiff Phyllis Abrams, pulling away from the stop sign after having stopped at said stop sign. The vehicle driven by Plaintiff Phyllis Abrams then stopped again suddenly just east of the painted white stop line, causing James D. Neason's vehicle to strike it on its rear bumper."

■■ ■ In our opinion the foregoing evidence was insufficient to sustain a summary judgment as a matter of law. The parties have cited a variety of cases in which the courts have grappled with the question of the propriety of directed verdicts or judgments *n.o.v.* in rear-end-collision cases. First of all, we would point out that the standard in those cases is different from the standard governing summary judgment. While some of the cases contain a broad statement that one who collides with a stopped vehicle is guilty of negligence as a matter of law (*e.g., Glenn v. Mosley* (1976), 39 Ill. App. 3d 172, 350 N.E.2d 219), none of them have applied a rule of strict liability. We deem it inconceivable that such a rule would exist. Rather, we find pertinent the following:

"A rear-end collision does not automatically create an inference as a matter of law that the driver of the rear car was negligent or that he was following too closely or driving too fast for conditions. It is the responsibility of the trier of fact to determine whether the rear driver, in such accidents, was acting reasonably under the circumstances, or that the accident was unavoidable." *Burgdorff v. International Business Machines Corp.* (1979), 74 Ill. App. 3d 158, 163, 392 N.E.2d 183, 186.

This rationale is entirely appropriate to the instant case. The evidence before the court indicated nothing more than that a rear-end collision had occurred. Plaintiffs argue that the city should have presented something to demonstrate that it was not liable. The argument overlooks the basic principle that it is the movant who bears the burden of establishing his entitlement to summary judgment.

The grant of summary judgment was reversible error.

■■ ■ The next issue concerns the admission of testimony concerning injury to Phyllis' left eye. The city maintains that there was no medical testimony establishing a causal connection between the accident and her eye problems and, thus, her own testimony concerning those problems occurring after the accident was inadmissible. Phyllis argues that she testified to striking her head on the steering wheel and then to the consequent symptoms. Her theory is that the determinative factor in the admissibility of such lay medical testimony is whether the testimony relates to symptoms or a medical diagnosis.

The general principles applicable to the admission of lay medical testimony as a basis for establishing a causal connection between an injury and a condition of ill-being were stated in *Jackson v. Navik* (1976), 37 Ill. App. 3d 88, 95-96, 346 N.E.2d 116, 123, as follows:

" 'Medical testimony is not necessary to prove the causal connection where the connection is clearly apparent from the illness and the circumstances attending it.' [Citations.]

Where the injury complained of is remote in time from the accident or the condition is one that is shrouded in controversy as to origin, such as the intervention of either a prior or subsequent injury or disease, layman testimony may be insufficient to establish a prima facie showing of causal relationship."

In our opinion the instant case presents a prime example of a situation in which the origin of an ailment is "shrouded in controversy" and lay testimony is unsufficient to establish a causal connection.

Dr. Faron testified that Phyllis' uncorrected vision was less clear after the accident. It is difficult to comprehend how there can be any vision, clear or otherwise, in an eye whose lens has been removed as a result of a cataract operation. Moreover, he testified that Phyllis suffered from hyperopia, astigmatism, and presbyopia and that these ailments can result in decreased vision over time.

Phyllis' own testimony is contradictory. On direct examination she stated that she noticed a blurring of vision between the time of the accident and her admission to the hospital. On cross-examination she stated that the blurring occurred on the second or third day in the hospital. As has been mentioned, Dr. Jemsek knew nothing about a possible eye injury. Phyllis stated that she told him nothing about it because he was not her optometrist.

Cases which have allowed the admission of lay testimony to establish a causal connection generally show an absence of a preexisting condition which might be the cause of ill-being. In *Mesick v. Johnson* (1986), 141 Ill. App. 3d 195, 490 N.E.2d 20, the plaintiff testified that she was thrown against the dashboard of the automobile and thereaf-

ter developed medical problems. The court allowed the testimony, but there was no evidence of any preexisting condition. The same was true in *Wiacek v. Hospital Service Corp.* (1973), 15 Ill. App. 3d 698, 304 N.E.2d 730, where the plaintiff was a victim of food poisoning. She testified to prior good health, but, after eating the spoiled food, she suddenly became ill, fell, and struck her head. Again, there was no evidence of a preexisting condition, and the court held that her evidence was sufficient to establish a causal connection.

In the case at bar, the preexisting condition, the cataract removal, was patent and admitted. Phyllis' testimony was insufficient to establish a causal connection between the accident and the blurred vision. Medical opinion was necessary.

■ Phyllis' final argument on this issue is that the error, if any, in the admission of her testimony was harmless since the ultimate verdict of $30,000 can be supported by her neck injury. We do not agree. She established special damages of only $700, and in argument to the jury her counsel asked for $150,000 for the eye injury and $75,000 to $100,000 for the neck injury. We cannot believe that such argument did not affect the jury's findings. A large part of the $29,300 for pain and suffering must have been allocated to the eye problem.

Since the case must be retried, we will comment briefly on the remaining issues for the guidance of the trial court and counsel.

The city has asked us to abolish the "might or could" rule. This rule of evidence permits an expert to state that a condition might or could be the result of a particular injury. The city points out that the historical basis for the rule, *i.e.*, that an expert could not invade the province of the jury by expressing an opinion on the ultimate issue, has disappeared. It maintains that the rule should be replaced by a rule requiring the expert to express an opinion in terms of percentage and further requiring a plaintiff's future medical damages be limited to the total amount of such damages multiplied by the percentage of probability that the plaintiff's condition for which such damages are sought was caused by the injury.

■ The theory has been the subject of recent learned comment. (See Howard, *Proving Causation with Expert Opinion: How Much Certainty is Enough?*, 74 Ill. B.J. 580 (1986).) The day may come when the "might or could" rule will be eliminated in this State and something else substituted therefor. However, it is not the province of an intermediate appellate court to do so.

The supreme court has expressly sanctioned the existing rule in *Clifford-Jacobs Forging Co. v. Industrial Com.* (1960), 19 Ill. 2d 236,

243, 166 N.E.2d 582, 587. The decisions of that court are binding upon all other Illinois courts. (*Agricultural Transportation Association v. Carpentier* (1953), 2 Ill. 2d 19, 27, 116 N.E.2d 863, 867.) We decline the invitation to overrule the supreme court.

■ The "might or could" rule is still functional, and it was not error for the trial court to permit Dr. Jemsek to testify in that manner.

■ We turn briefly to some evidentiary matters. Over objection Dr. Jemsek was permitted to testify as to possible side effects of the drugs Flexiril and Naprosyn which he had prescribed for Phyllis. The city assigns this as error since she never testified that she had experienced any such symptoms. We do not agree. Phyllis' exposure to such potential side effects was relevant as a compensable element of damage.

The city also claims error in the admission of Dr. Jemsek's testimony regarding the degenerative changes in Phyllis' cervical spine. He stated that this condition could be aggravated by trauma. Again, this was relevant as a damage element.

No error occurred in the admission of either of these items of testimony.

The final issue which we have elected to address concerns a portion of the closing argument of plaintiffs' counsel. We have already held that Phyllis' testimony concerning her eye problems was inadmissible. Counsel argued vigorously over objection that this constituted a disability as follows:

"MR. AULER [Plaintiff's Counsel]: Mrs. Abrams has suffered a deterioration of her vision due to this accident. How much is an eye worth? I would suggest to you that to a normal visioned person it might be worth hundreds and hundreds of thousands of dollars for a person to have lost that sight entirely.

MR. RAY [Defense Counsel]: Object, Your Honor. That's improper argument.

THE COURT: Overruled. Continue, please.

MR. AULER: What is the fair percentage for her losses? There was some testimony in this case that she had gone up to 20/40, 20/60, 20/80 when she had originally been corrected to about 20/25. That's a big loss. What would be the fair evaluation for the loss of that one eye?

MR. RAY: Your Honor, I want to object to this whole line of argument. It seems to suggest that there is some element of damage here that the jury is not going to be instructed about.

The jury's going to be instructed about two elements, and I submit that this is not included within those two elements.

MR. AULER: Your Honor, I wish to renew the point I made yesterday with respect to permanent disability and the instruction to the jury, and I tendered that.

THE COURT: Yes, the objection will be overruled. Go ahead, Counsel.

MR. AULER: With respect to her vision, she's now down to a cataract in the right eye. That makes it far more significant for you to evaluate what this vision loss would be.

MR. RAY: If the Court please—excuse me, Bob. If the Court please, I'd like to show a continuing line of objection.

THE COURT: I beg your pardon?

MR. RAY: I'd like to show a continuing objection to this line of argument.

THE COURT: All right, you may show it.

MR. AULER: If you believe that she has suffered a decrease in loss of vision to that left eye, you must take it into account in terms of what she's likely to have to cope with in the future. If that left eye is more significant to her now even than at the time of the collision, then I suggest to you the injury to it should be worth far more money. How much? Perhaps $150,000.00. That would be, I suggest to you, a minimum amount to consider for it."

The damage instruction given to the jury contained only two elements:

"The pain and suffering experienced as a result of the injuries.

The reasonable expense of necessary medical care, treatment, and services rendered."

In the instruction conference the court indicated that it would not give an instruction on disability as part of plaintiffs' damages.

▆▆ Closing argument of counsel must conform to the instructions which the court has indicated it will give. (*Martin v. Allstate Insurance Co.* (1981), 92 Ill. App. 3d 829, 834, 416 N.E.2d 347, 351.) It was therefore error for the court to permit the argument. There was no competent evidence in the record to support it and there was no instruction on which it could be based.

Since we are reversing and remanding for a new trial, we need not consider the city's additional assignment of error: (1) that the verdicts were against the manifest weight of the evidence; (2) that the 20% contributory negligence assigned to plaintiffs was against the

manifest weight of the evidence; and (3) that Neason's admission of fault was inadmissible following a summary judgment on liability in favor of plaintiffs.

In summary, it was error to enter summary judgment for plaintiffs on the question of liability; it was error to admit Phyllis' testimony to establish a causal connection between the accident and her eye problems; and it was error to permit counsel to argue the eye question to the jury.

The judgment of the circuit court of Coles County is therefore reversed and the cause is remanded to that court for a new trial in conformity with the views expressed in this opinion.

Reversed and remanded for a new trial.

McCULLOUGH, P.J., and MORTHLAND, J., concur.