VICKIE R. SEAMAN, Adm'r of the Estate of Wilbur D. Seaman, *et al.*, Plaintiffs and Counterdefendants-Appellants, v. LLOYD R. WALLACE *et al.*, Defendants and Counterplaintiffs-Appellees.

Fourth District No. 4—90—0039

Opinion filed October 11, 1990.

620

Edward H. Rawles, of Reno, O'Byrne & Kepley, P.C., of Champaign, for appellants.

Robert D. Winters, of Armstrong, Winters, Prince, Featherstun & Johnson, of Decatur, for appellees.

JUSTICE SPITZ delivered the opinion of the court:

This is an appeal from a jury finding for plaintiffs in their cause of action against defendants arising from an automobile collision. Plaintiffs appeal the apportionment of fault and the award of zero damages for the loss of consortium.

Plaintiff Vickie Seaman brought suit against defendants Lloyd R. Wallace and Herbert Trucking, Inc., individually; as administrator of the estate of Wilbur D. Seaman; and as mother and as mother and next friend of Rae Ellen Seaman, Christina Jean and Jacob Dean Seaman. Plaintiffs sought damages for wrongful death and personal injuries sustained as a result of a collision between a pickup truck driven by decedent Wilbur Seaman, and occupied by decedent's daughter, Rae Ellen, and a tractor-trailer-tanker driven by Lloyd Wallace. Plaintiffs' complaint included causes of actions for (1) the wrongful death of decedent; (2) a survival action for the 28 days decedent lived after the collision; (3) an action for the medical, funeral and burial expenses related to decedent; and (4) a count for loss of consortium for his wife, Vickie Seaman, individually. Vickie Seaman also brought an action (5) as mother and next friend of Rae Ellen Seaman for personal injuries suffered in the accident. Plaintiffs based each count on defendants' alleged neglect and wilful and wanton acts.

Defendants filed a counterclaim for contribution against plaintiff Vickie Seaman as administrator of the estate of Wilbur Seaman. The counterclaim sought contribution from the administrator on any judgment entered on the claim of Rae Ellen Seaman for fault attributed to Wilbur Seaman.

### I. TRIAL

The accident in question occurred at approximately 3:30 p.m., November 24, 1986, at an intersection of two country roads, McDonald Road and Ridlen Road. The site is approximately two miles west and one mile south of Dalton City, in Macon County, Illinois. Defendant Wallace was operating a tractor-trailer-tanker owned by his employer,

Herbert Trucking, Inc., and was traveling south on McDonald Road (a north-south road). Wilbur Seaman was driving a pickup truck, with his daughter Rae Ellen as a passenger, in an easterly direction on Ridlen Road (an east-west road). The intersection of the two roads was open, with no traffic-control devices, stop signs, or yield signs at any point of the intersection. There were no obstructions to the views of drivers of vehicles approaching the intersection from the north on McDonald Road or from the west on Ridlen Road within a half-mile area of the intersection.

The only eyewitness testimony at trial concerning the accident was that of defendant Wallace, the driver of the tanker. Wallace testified that he had been employed at Herbert Trucking in Macon, Illinois, since March 1986. The tractor-trailer involved in the accident was 53 feet long, weighed an estimated 60,000 pounds with a full load, and had five axles, three on the cab, and two on the rear of the trailer. The tractor-trailer was owned by Herbert Trucking. Wallace had been hauling loads of liquified lime fertilizer since 6 a.m. that morning from a plant in Decatur to various farm locations. As Wallace approached the intersection with a full load of liquified lime, the sun was shining, but it was a bit hazy. The roads at the intersection were flat oil-and-chip roads and were dry at the time. This was the first time Wallace drove the tractor-trailer on this road. Wallace approached the intersection from the north on McDonald Road. After stopping at a stop sign, Wallace started up and achieved a speed of about 32 or 33 miles per hour.

Approximately a quarter mile north of Ridlen Road, Wallace looked right (west) onto Ridlen to check for traffic. Wallace saw a clear road with some farm buildings half a mile up the road. The sun interfered "a little bit" with Wallace's vision, but "not a great amount." Wallace did not consider slowing down, however, and the haze did not affect his ability to see the farm buildings, or to later see the pickup truck. Wallace looked to the left for traffic and saw no cars. From this point on, and until the accident, Wallace never reduced his speed. At approximately 275 feet before the intersection, Wallace saw decedent's pickup approaching the intersection. Wallace judged the pickup to be approximately one-eighth of a mile, or 660 feet, from the intersection at that time. Wallace was traveling at approximately 32 to 34 miles per hour at this time and believed the pickup was "running close to 60 miles an hour, or maybe faster at that time." Wallace based this opinion as to the pickup truck's speed on a "quick look." Wallace had no special training, or other experience, which would have trained him to make an estimate of the dis-

tance or speed of a moving object. In a written report given to the investigating deputy sheriff the evening of the accident, Wallace made no mention of the speed of the Seaman pickup.

From the time he saw the pickup, Wallace never reduced his speed and never applied the brakes before entering the intersection. According to Wallace, his brakes were in good working order on the day of the accident. When Wallace was between 100 to 150 feet from the intersection, he accelerated. In his deposition, Wallace admitted giving the tractor-trailer full throttle. Wallace did not measure the 100 to 150 feet, but instead arrived at the figure using his "best judgment." Wallace did not know how far the pickup was from the intersection when he decided to accelerate.

When the front of Wallace's tractor crossed the south line of the intersection, but while the trailer of his vehicle was still in the intersection, Wallace felt the impact of the Seaman pickup colliding with his trailer. The pickup became lodged under the tanker and was dragged as the tractor-trailer continued through the intersection and until it came to a stop. At the moment of impact, Wallace believed he was traveling at 32 to 33 miles per hour and that the front of the trailer portion of his rig was 25 feet south of the center of the intersection. Wallace did not apply the brakes of his tractor after the impact and was not sure whether the brakes on his tractor-trailer locked up after the accident. However, Wallace later testified that the air brakes on his tractor-trailer were engaged because the air line was broken by the impact. After the accident, the tractor-trailer ultimately stopped 140 feet from the intersection. The front of the pickup was protruding from the driver's side of tractor-trailer. Although the tractor-trailer was driven from the scene of the accident, the first of the two axles on the rear of the tanker where the pickup hit was bent and had to be replaced.

After the accident, Wallace prepared a written statement for deputy sheriff David Buker. This written statement included:

> "I was driving south on a country road two miles west and one mile south of Dalton City, Illinois. As I approached the intersection I looked both ways, but the sun was in my eyes and didn't notice the truck at first. When I did see it I knew I couldn't stop, but thought I would get across the intersection before the other truck got there. At about the time I thought I had cleared the crossing I heard the truck hit the one I was driving."

Wallace further testified that he had never made an emergency stop before, but knew what would happen if he slammed on the

brakes in this type of situation. Wallace had been told not to apply the brakes suddenly. Wallace also did not know how fast the truck would stop if he slammed on the brakes.

David Buker, a detective with the Macon County sheriff's department, also testified. Buker investigated the scene of the accident. When Buker arrived at the accident scene, the vehicles were located approximately 200 feet south of the intersection. As a result of the impact, the rear of the tanker went off the side of the road on the east side of McDonald. Buker believed the entire set of dual wheels of the trailer was off the road. The front of the pickup was underneath the tanker, with the front end coming out slightly on the east side of the tanker.

The front axle of the pickup truck was approximately 149 feet south of the intersection. The rear of the tractor-trailer was approximately 140 feet 6 inches from the intersection. Buker also observed the rear tandem dual wheels of the tractor-trailer. Buker believed the Seaman vehicle hit the tractor-trailer just before the front of the rear dual wheels and that the impact knocked them out of alignment. Buker also believed the changed wheel alignment pulled the tractor-trailer off the side of the road by steering the trailer in that direction. Buker did not think the physical force of the impact completely drove the trailer off the side of the road.

Buker then described the tire marks made by the pickup in attempting to avoid the accident. The total distance of the brake skid was 161 feet. Buker later testified that the skid marks would be closer to 171 or 172 feet when including the skid marks through the intersection. In addition to the skid marks, there were indications that the pickup's brakes had been applied 15 feet earlier. The point of impact was 13 feet 3 inches east of the west side of McDonald Road.

Also testifying about the accident was Lewis Metz, a professor of general engineering at the University of Illinois, who testified on behalf of plaintiff. Metz testified to the stopping distance of a tractor-trailer on an oil-and-chip road. Metz believed a 67,000- or 68,000-pound vehicle, with normal operable brakes in good condition, traveling between 30 and 35 miles per hour, on a clear day on a dry oil-and-chip road surface could come to a complete stop in 130 feet, including reaction time (1½ seconds, or 70 feet). Thus, once brakes were applied in a vehicle similar to defendants', the vehicle could stop in about 60 feet. The vehicle's length, 53 feet, did not affect stopping time.

Under cross-examination, Metz testified that the method he used to determine the stopping distance in this case was a relatively simple

test, involving the use of a weighted tire, a fish scale, and a set of tables. There was another, more accurate method to test actual stopping distance, using the vehicle itself, which was not performed. Metz also testified that reaction time varies and could have been greater in a tractor-trailer in this situation.

Also testifying was plaintiff Vickie Seaman, decedent's wife. Vickie Seaman testified she was married to the decedent, and the marriage was happy, but had its share of problems. When asked about the decedent's relationship with the children, Vickie Seaman replied:

"We would go camping just about every weekend. We would go camping together, any family vacation we could we would leave town and we would go—took the kids to the zoo. We went to different amusement parks. He helped with the sports with the kids. They were really into that."

Several doctors also testified that Wilbur Seaman was hospitalized in a comatose state the entire period he survived.

During the instruction conference, the defendants tendered Illinois Pattern Jury Instructions, Civil, No. 70.02 (2d ed. 1971) (hereinafter IPI Civil 2d), supplemented with the last paragraph of IPI Civil 2d No. 60.01, which read:

"At the time of the occurrence in question, there was in force in the State of Illinois a statute governing the operation of motor vehicles approaching intersections.

If two vehicles are approaching an intersection from different highways at such relative distances from the intersection that if each is being driven at a reasonable speed, the vehicle on the right will enter the intersection first or both vehicles will enter the intersection at about the same time then this statute requires the driver of the vehicle on the left to yield the right of way to the vehicle on the right.

On the other hand, if two vehicles are approaching the intersection from different highways at such relative distances from the intersection that if each is being driven at a reasonable speed, the vehicle on the left will enter the intersection and pass beyond the line of travel of the vehicle on the right before the vehicle on the right enters the intersection, then this statute requires the driver of the vehicle on the right to yield the right of way to the vehicle on the left.

The fact that a vehicle has the right of way does not relieve its driver from the duty to exercise ordinary care in approaching, entering and driving through the intersection.

If you decide that a person violated the statute on the occa-

sion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not a person was negligent before and at the time of the occurrence."

Defense counsel discussed this instruction, and which vehicle had the right-of-way, with the jury during his closing argument. Defense counsel stated:

"If, when both vehicles, again, are traveling at a reasonable rate of speed, and Mr. Seaman wasn't even doing that—he didn't meet that qualification—if the vehicle coming from the left, *if the front of that vehicle will pass the line of crossing, that is, where the tracks of the two vehicles would cross the lines delineating the intersection,* if the vehicle from the left reaches that before the vehicle from the right, traveling at a reasonable rate of speed would enter the intersection, then the vehicle from the left has the right-of-way." (Emphasis added.)

Plaintiffs' counsel objected to defense counsel's statements regarding the right-of-way and argued that defense counsel incorrectly interpreted the instruction. The court overruled the objection. Defense counsel further argued that Wallace's tractor-trailer had passed the line of crossing when the Seaman pickup truck entered the intersection, and the tractor-trailer had the right-of-way. Defense counsel later told the jury:

"And I think under the law the vehicle coming from the left does have the right-of-way if traveling at a reasonable speed it reached this line of passing where the tracks of the vehicle would cross before the Seaman vehicle, or the vehicle coming from the right would not enter the intersection traveling at a reasonable rate of speed.

Two Things: the Wallace vehicle did reach that line of passing and beyond the intersection before Mr. Seaman entered the intersection. And Mr. Seaman wasn't traveling at a reasonable rate of speed. So there are two factors there that shift the right of way to the Wallace vehicle. It got that far through the intersection and Mr. Seaman was going too fast."

Counsel for the Seaman estate responded to defense counsel's remarks in his closing, stating:

"Essentially [IPI Civil 2d No. 70.02] says that the tanker has the right-of-way if the relative distance of the vehicles from the intersection were [*sic*] such that if each were being driven at a reasonable speed, the tanker would pass clear of the pickup's line of travel before the pickup enters the intersection. Well, we

know that didn't happen."

Defense counsel objected at this point and argued that the instruction focused on the front of the vehicle. Defense counsel's objection was overruled. Counsel for the Seaman estate continued:

"We know that the tanker did not pass clear of the pickup's line of travel. When you read the instruction you will find that is exactly what the instruction says. Under that circumstance, the only way the tanker has the right-of-way then is if the pickup was being driven at an unreasonable speed."

Later, in rebuttal closing argument, plaintiffs' counsel argued:

"Before you forget, you have heard a lot of talk about the right-of-way. [Defense counsel] made a point of it by a reference to the front of his client's vehicle. Remember that he said front. Read the instructions when you get back there. It does not say that. It says before anybody from the left has the right of way, first of all, they have to be traveling at a reasonable rate of speed."

Plaintiffs' counsel continued by arguing that vehicles have a duty to slow down at an intersection and that the Wallace vehicle failed to do this and thus lost the right-of-way. Plaintiffs' counsel continued:

"Even if he [Wallace] is operating at a reasonable rate of speed, which would be requiring him to be reducing his speed, slowing as he goes across there, the right-of-way statute says he has got to be able to make it into and out of the line of travel of the other vehicle, and we know that wasn't the case here. He did not have the right-of-way. Otherwise, what I would suggest to you is the ridiculous scenarios where you have people racing in the center of an intersection to get their nose in front. So then there is a crash into somebody's side. 'Hey, I was right in the center of the intersection. I had the right of way.' Statutes do not allow you to do that. They don't allow you to do what Mr. Wallace did. He has to be able to pass beyond the line of travel of the other vehicle before you ever have the right-of-way."

The court instructed the jury and deliberations began. During deliberation, the jury sent a written question to the judge which read: "In determining right of way, can you define what 'beyond the line of travel' is?" The court proposed to send back an answer that the jury had to decide the meaning of "beyond the line of travel" without further instruction. Plaintiffs' counsel objected and asked the court to instruct the jury that "pass beyond the line of travel" meant clear the intersection before the vehicle on the right entered it. Plaintiffs' coun-

sel believed that defense counsel's closing statement had confused the jury. Defense counsel responded that cases have used the language "the latter (vehicle from the left) will reach the line of crossing," and argued that it meant the front of the vehicle from the left must reach the line where the pathways cross to gain the right-of-way. The court noted that it instructed the jury to use only the law the court gave it, and any further instruction would confuse the jury. The court overruled plaintiffs' objection and refused to give further instruction to the jury.

The jury found for plaintiffs in the wrongful death action, assessing damages in the amount of $1,579,007. However, the jury found decedent's comparative negligence to be 75%, and defendants' negligence to be 25%, thus awarding plaintiffs $394,751.75 on the wrongful death claim. The jury returned in favor of defendants on the wilful and wanton count of the wrongful death action. The jury also found in favor of plaintiffs for the survival action in the amount of $85,071.55, with 75% negligence attributable to plaintiffs' decedent. Plaintiffs were thus awarded $21,267.89 for the survival action. The jury returned verdicts in favor of defendants on the wilful and wanton count of the survival action.

On the individual count of Vickie Seaman for loss of consortium under the negligence theory, from the date of the accident until the date of Wilbur Seaman's death, the jury found for plaintiff, but awarded zero damages. The jury found in favor of defendants on the count for loss of consortium based on wilful and wanton conduct.

Finally, the jury found in favor of plaintiff for the cause of action for Rae Ellen Seaman under the negligence theory and assessed damages in the amount of $42,717.96. The jury found in favor of defendants on the wilful and wanton count asserted on behalf of Rae Ellen Seaman. However, the jury also found in favor of defendants-counterplaintiffs on their claim for contribution and apportioned damages awarded for Rae Ellen Seaman as 25% to counterplaintiffs and 75% to counterdefendant Vickie Seaman, as administrator of the estate of Wilbur Seaman.

Plaintiffs filed a timely post-trial motion seeking a new trial on the issue of apportionment as to fault on the wrongful death claim, the survival action, and the damages for Rae Ellen Seaman. Plaintiff Vickie Seaman also sought a new trial for loss of consortium on the issue of damages based on the inconsistency of the finding for plaintiff with an award of zero damages; she argued the burden-of-proof instruction required a finding of damages to return a verdict in favor of plaintiff. The court denied plaintiffs' motions and addressed plain-

tiffs' argument that defense counsel misstated the law of right-of-way: "Be that as it may, if the remark by [defense counsel] was error it was harmless error, and the jury had proper instructions, and the verdict is supported by the evidence." Plaintiffs filed a timely notice of appeal.

## II. ANALYSIS

On appeal, plaintiffs raise four issues: (1) whether plaintiffs are entitled to a new trial on the apportionment of fault; (2) whether the jury's assignment of 75% comparative fault was against the manifest weight of the evidence; (3) whether plaintiff Vickie Seaman is entitled to a new trial on the issues of damages for loss of consortium; and (4) whether plaintiff Vickie Seaman, as counterdefendant, is entitled to a new trial on the counterclaim for contribution. We affirm the trial court.

### A. ENTITLEMENT TO NEW TRIAL: DEFENDANTS' ARGUMENT ON RIGHT-OF-WAY, AND THE TRIAL COURT'S HANDLING OF OBJECTIONS THERETO AND OF JURY'S REQUEST FOR FURTHER CLARIFICATION OF THE LAW OF RIGHT-OF-WAY

Plaintiffs first argue for a new trial on the apportionment of fault because (1) defense counsel made incorrect statements concerning the right-of-way during closing argument so as to warrant reversal; (2) the trial court overruled plaintiffs' objection to defense counsel's incorrect statements concerning the right-of-way, which in effect endorsed and adopted the argument as a correct statement of the law; and (3) the jury requested further clarification on the law of right-of-way on account of defense counsel's incorrect statements, and the trial court refused plaintiffs' request to give the jury further instructions. We agree that defense counsel made improper argument to the jury. However, we find that the improper argument, along with the court's subsequent actions, did not affect the jury's decision.

#### (1) DEFENDANTS' ARGUMENT ON, AND THE LAW OF, RIGHT-OF-WAY

■ Attorneys have the right to comment on anticipated instructions during closing argument. (*Coyne v. Avery* (1901),189 Ill. 378, 59 N.E. 788.) However, closing argument of counsel must conform to the instructions which the court has indicated it will give, and it is error for a court to permit argument which does not conform to the instructions. *Abrams v. City of Mattoon* (1986), 148 Ill. App. 3d 657, 499 N.E.2d 147, *appeal denied* (1987), 113 Ill. 2d 571, 505 N.E.2d 350.

■ Defense counsel argued to the jury that the tractor-trailer had

the right-of-way under Illinois law because the *front* of his vehicle had passed the "line of crossing" before the Seaman vehicle entered the intersection. Plaintiffs contend, and we agree, that defense counsel's statement to the jury was an incorrect interpretation of the law.

Section 11—901 of the Illinois Vehicle Code (Code) provides that when two vehicles approach or enter an intersection from differing roadways at approximately the same time, the driver of the vehicle on the left must yield the right-of-way to the vehicle on the right. (Ill. Rev. Stat. 1987, ch. 95½, par. 11—901(b).) This right-of-way for the driver coming from the right, however, is not absolute. (*Relli v. Leverenz* (1974), 23 Ill. App. 3d 718, 719-20, 320 N.E.2d 169, 170.) A car from the left has the right-of-way if, considering the relative distances from the intersection, with both cars driven at a reasonable speed, the car on the left will enter the intersection and *pass beyond the line of travel* of the vehicle on the right before the vehicle on the right enters the intersection. (IPI Civil 2d No. 70.02; see *Payne v. Kingsley* (1965), 59 Ill. App. 2d 245, 250, 207 N.E.2d 177, 179 (stating jury was properly instructed under No. 70.02 of IPI as to the right-of-way statute in question (Ill. Rev. Stat. 1963, ch. 95½, par. 165)).) At issue in the present case is what the language "reach the line of crossing," from earlier case law, or "pass beyond the line of travel," from case law and the Illinois Pattern Jury Instructions (IPI) means precisely.

Cases decided under early right-of-way statutes made clear that a driver did not have an unqualified right-of-way simply because he was approaching from the right:

> "While the statute gives the right of way to vehicles approaching along intersecting highways from the right over those approaching from the left, it manifestly does not intend to confer that right regardless of the distance the approaching cars may be from the point of intersection. It does not contemplate that the right may be invoked when the car from the right is so far from the intersection at the time the car from the left enters upon it, that, with both running within the recognized limits of speed, the latter will reach the *line of crossing* before the former will reach the intersection." (Emphasis added.) (*Salmon v. Wilson* (1923), 227 Ill. App. 286, 288.)

While the phrase "reach the line of crossing" is ambiguous, the *Salmon* court later clarified the language:

> "Under the state of facts in this case plaintiff might reasonably have presumed that defendant would not exceed the speed limits fixed by statute, and that he would be able to *cross the in-*

*tersection before defendant's car [the car from the right] reached it."* (Emphasis added.) (*Salmon,* 227 Ill. App. at 288.) (See also *Heidler Hardwood Lumber Co. v. Wilson & Bennett Manufacturing Co.* (1926), 243 Ill. App. 89, 94.) While the right-of-way statute has been rewritten several times, the judicial interpretation of the right-of-way espoused in the *Salmon* and *Heidler* cases has remained the same. See *Kirchoff v. Van Scoy* (1939), 301 Ill. App. 366, 371, 22 N.E.2d 966, 968; *Gauger v. Mills* (1950), 340 Ill. App. 1, 6-7, 90 N.E.2d 790, 792-93; *Leonard v. Murphy* (1957), 13 Ill. App. 2d 39, 45, 140 N.E.2d 537, 540; *Relli,* 23 Ill. App. 3d at 720, 320 N.E.2d at 170.

The IPI comments to the instruction on right-of-way at an intersection, explaining the effect of a violation of the current right-of-way statute, section 11—901, as well as case law, make it clear that the driver "on the left would have the right-of-way if it could, while being driven at a reasonable speed, clear the intersection before the vehicle on the right entered it, even if the car on the right could be said to have been approaching the intersection 'at approximately the same time.'" (IPI Civil 2d No. 70.02, Comment at 262.) Defendants, however, argued at trial, and argue on appeal, that the tractor-trailer, the car coming from the left, had the right-of-way because its *front* reached the line of crossing, the "line where the pathways cross" before the vehicle from the right entered the intersection. Defendants cite several cases which use the "reach the line of crossing" language to support this argument, including *Goldsborough v. McDavid* (1953), 349 Ill. App. 466, 110 N.E.2d 875 (abstract of opinion). A reading of *Goldsborough* in its entirety, however, reveals that defendants are incorrect in their interpretation. The *Goldsborough* court included two other definitions of the law of right-of-way in its opinion which clarify the "line of crossing" language: (1) the vehicle to the left must yield the right-of-way when, traveling at a reasonable speed, the driver sees that unless he yielded the right-of-way the vehicles could or would collide; and (2) the driver of any vehicle approaching an intersection from the right has the right-of-way over one approaching from the left, unless the car on the right is at such a distance that, if driven with due care, it will not reach the intersection until the car from the left can, if driven with due care, *pass the intersection in safety.* These two definitions of the right-of-way law clearly negate defendants' argument that the vehicle on the left has the right-of-way if its *front* reaches the line of crossing before the other vehicle enters the intersection.

Moreover, the "reach the line of crossing" language used by the *Goldsborough* court clearly comes from earlier cases such as *Salmon*

in which courts have clarified the language by stating that the car from the left must be able to clear the intersection, not simply have its front reach the intersection, to gain the right of way. The other cases defendants cite support this argument only to the extent they use the ambiguous "reach the line of crossing" language and thus do not support defendants' argument. See *Leonard*, 13 Ill. App. 2d 39, 140 N.E.2d 537; *Wood v. Reck* (1954), 2 Ill. App. 2d 169, 118 N.E.2d 442 (abstract of opinion); *Partridge v. Enterprise Transfer Co.* (1940), 307 Ill. App. 386, 30 N.E.2d 947.

It should also be noted that the "reach the line of crossing" language was developed in cases prior to IPI Civil 2d No. 70.02. The IPI committee changed this ambiguous language to "pass the line of travel of the vehicle on the right" in the right-of-way instruction.

Defendants argue, however, that if their interpretation of the right-of-way statute is not correct, a vehicle from the left, if ever hit in an unmarked intersection by a car coming from the right, would never have the right-of-way. Defendants support this assertion by arguing the facts in *Payne*, which they believe demonstrate that the court did not interpret IPI Civil No. 70.02 to mean that the rear of the vehicle on the left must pass beyond the line of travel to gain the right-of-way. In *Payne*, a motorcycle, coming from the left, was hit by a car coming from the right in an unmarked intersection. The court upheld a finding of guilt on the part of the car coming from the right. Defendants' argument is without merit because the focus in determining if the driver on the left had the right-of-way is not on whether the car from the left physically passed the intersection first, but instead on whether the driver from the left reasonably thought, taking into account the relative speed and distances of the cars, that he could cross the intersection. This determination is to be made by the jury. (*Payne*, 59 Ill. App. 2d at 250, 207 N.E.2d at 179.) As the appellate court in *Payne* noted, whether the driver of the motorcycle was justified in believing he could safely proceed through the intersection was properly for a jury to determine. *Payne*, 59 Ill. App. 2d at 250, 207 N.E.2d at 179.

Defendants' interpretation of the right-of-way instruction, if correct, would create a race to the intersection. The car that made it to the intersection first and got his front past the "line of crossing" would have the right-of-way. Such an interpretation would not only result in more accidents, it would penalize the driver on the right for braking and slowing down at an unmarked intersection, as may be his statutory duty under section 11—601 of the Code. (Ill. Rev. Stat. 1987, ch. 95½, par. 11—601.) The driver who failed to slow down

would get the front of his vehicle past the "line of crossing" before the other vehicle reached the intersection.

■ We conclude that the correct view of the right-of-way law in Illinois is that focusing on the positions of the vehicles as they approach the unmarked intersection. The jury must decide, after taking into account the relative speed and distances of the cars, whether the driver of the vehicle on the left was justified in believing he could pass through the intersection, that is, clear the intersection, before the vehicle on the right entered the intersection. If so, the vehicle on the left may be deemed to have had the right-of-way.

### (2) EFFECT OF OVERRULING OBJECTIONS TO RIGHT-OF-WAY ARGUMENT

■ Plaintiffs next argue that defense counsel's error was compounded by the court overruling plaintiffs' objection to defense counsel's incorrect statement of law. The trial court has a duty to prevent argument by counsel which gives an incorrect statement of the law. (*Backlund v. Thomas* (1963), 40 Ill. App. 2d 8, 189 N.E.2d 682.) Where an attorney inadvertently makes improper remarks, the prejudicial effect of such a statement is usually removed where the court promptly sustains an objection thereto and the attorney makes retraction in good faith. (*Mattice v. Klawans* (1924), 312 Ill. 299, 310, 143 N.E. 866, 871.) However, when a trial court fails to overrule an objection to an incorrect statement of law, it may have the effect of lending the court's approval to the misstatements and adopting the misstatements as its instructions, thereby impinging upon the opposing side's right to a fair trial. (*Bulleri v. Chicago Transit Authority* (1963), 41 Ill. App. 2d 95, 101-02, 190 N.E.2d 476, 479.) Whether misstatements by counsel actually prejudice the losing party or unduly affect the outcome of the case is a question unique in each case and must be decided on the facts and circumstances arising from that case. *Allison v. Howell* (1974), 22 Ill. App. 3d 287, 317 N.E.2d 379.

In *Bulleri*, plaintiff's counsel misstated the burden of proof to the jury and defense counsel objected. The court allowed plaintiff's counsel to continue. Plaintiff's counsel again made the same misstatement to the jury. The appellate court found that the trial court's actions, allowing plaintiff's counsel to continue, lent its weight to the repeated misstatements and in effect adopted them as its instructions to the jury, which impinged upon defendant's right to a fair trial. The appellate court reversed because defense counsel's error, along with numerous other errors objected to and overruled, had a cumulative effect that was grossly prejudicial.

In *Allison*, plaintiffs complained of three errors defense counsel

made. During cross-examination, defense counsel asked an improper question, and, in summation, defense counsel made an incorrect statement of law and a prejudicial reference to a witness' long hair and manner in which he testified. Plaintiffs' objections to these errors were overruled. The appellate court reversed and noted that although the instant case had fewer errors than in *Bulleri*, the court believed the three errors of defense counsel and the subsequent objections and overrulings were enough to substantially prejudice the rights of plaintiffs.

In the instant case, defense counsel clearly misstated the law of right-of-way to the jury, and the court overruled plaintiffs' specific objection to the incorrect statement. However, both counsel for plaintiffs, and Vickie Seaman as counterdefendant, argued their interpretation of the instruction to the jury and told the jury defense counsel's interpretation was incorrect. Moreover, the trial court instructed the jury only to obey the instructions the court had given it.

■ We finally note here that in ruling on post-trial motions, the court stated: "Be that as it may, if the remark by [defense counsel] was error it was harmless error, and the jury had proper instructions, and the verdict is supported by the evidence." The decision of the trial court that argument was not prejudicial error is entitled to great weight. (*Goad v. Evans* (1989), 191 Ill. App. 3d 283, 310, 547 N.E.2d 690, 708.) In *Goad*, defendant argued on appeal that a portion of plaintiff's closing argument was prejudicial and required reversal. The appellate court noted that defendant brought the argument to the attention of the trial court in his post-trial motion and that the trial court did not believe the argument affected the jury. The appellate court reasoned that because the trial court was in the best position to judge the effect of the argument on the jury, its finding was entitled to great weight and would not be lightly disturbed on appeal.

### (3) JURY REQUEST FOR FURTHER CLARIFICATION ON LAW OF RIGHT-OF-WAY

■ Plaintiffs next argue that the court had a duty to further instruct the jury and clear up the confusion defense counsel created when he incorrectly argued the right-of-way instruction to the jury. In a civil case, it is within the sound discretion of the trial court to allow or refuse a jury's request for clarification of jury instructions. (*Kinston v. Turner* (1987), 115 Ill. 2d 445, 463, 505 N.E.2d 320, 328.) Once a jury has been correctly instructed, it is not error for the trial judge to leave standing the original instructions. But, where the original instructions are incomplete *and* the jurors are clearly confused,

the trial court's discretion gives way to a duty to further instruct the jurors. *Kingston*, 115 Ill. 2d at 463, 505 N.E.2d at 328.

Although plaintiffs believe that IPI Civil 2d No. 70.02 is arguably inadequate, they do not advance this issue on appeal. Instead, plaintiffs argue only that defense counsel's statement in closing regarding the right-of-way law clearly confused the jury—it did not know whether a vehicle had the right-of-way if its front reached the center of the intersection first, or whether the vehicle on the left had to be able to pass beyond the line of travel and clear the intersection. Plaintiffs also note that the jury needed further instruction because the court overruled plaintiffs' objection to defendants' incorrect assessment of the right-of-way law.

■ While defense counsel improperly argued to the jury the meaning of the right-of-way instruction, and the trial court overruled plaintiffs' objection, we believe the error to be harmless. Not only did counsel for plaintiffs and counsel for Vickie Seaman as counterdefendant tell the jury that defense counsel's argument was incorrect, the trial court overruled defense counsel's objection to counterdefendant's counsel's argument and later instructed the jury to use only the law the court had given it. Moreover, the trial court's decision that the error was harmless is entitled to great weight. We also hold that the trial court did not err in refusing to further instruct the jury. Plaintiffs do not argue that the instruction itself was ambiguous, and any further instruction might only have confused the jury. Any other conclusion would be speculation on our part.

### B. CHALLENGE TO JURY'S APPORTIONMENT OF FAULT

Plaintiffs' second contention on appeal is that the jury's assignment of 75% comparative fault to decedent was against the manifest weight of the evidence. Plaintiffs seek a new trial on the apportionment of fault on the counts in negligence for the wrongful death action, the survival action, and the loss of consortium action.

■ The proper standard to be applied on review of a comparative negligence case is whether the decision is against the manifest weight of the evidence. (*Junker v. Ziegler* (1986), 113 Ill. 2d 332, 498 N.E.2d 1135.) A verdict is not against the manifest weight of the evidence unless a contrary conclusion is clearly evident, plain, and indisputable. *Harris v. Day* (1983), 115 Ill. App. 3d 762, 451 N.E.2d 262.

Plaintiffs argue that the jury apparently resolved the question of who had the right-of-way in favor of defendants. Plaintiffs believe the jury ignored the uncontested facts because Wallace was unjustified in believing he could safely proceed and clear the intersection, given the

speed and distance of the two vehicles as they approached the inter-section. The ultimate collision, plaintiffs argue, demonstrates that Wallace's judgment was completely unreasonable. Plaintiffs rely on the following facts to support this argument: (1) the intersection where the accident occurred was open with no obstructions of Wallace's view for one-half mile looking west (right) on Ridlen Road; (2) the sun interfered with Wallace's view the first time he looked west down Ridlen Road; (3) after observing the Seaman vehicle, Wallace made no attempt to reduce his speed or apply his brakes, but instead continued at the same speed toward the intersection; (4) Wallace accelerated 100 to 150 feet before the intersection in violation of section 11—601 of the Code (Ill. Rev. Stat. 1987, ch. 95½, par. 11—601), which requires vehicles to slow down when approaching intersections; (5) Wallace did not look to determine the location or speed of the Seaman truck when it accelerated; (6) Wallace had ample stopping distance, as expert testimony was that he could have stopped his tractor-trailer in 130 feet, and defendants presented no testimony to contradict this; (7) the Seaman truck hit the tractor-trailer in the intersection; and (8) skid marks from the Seaman truck indicate that the Seaman vehicle was slowing down, clearly obeying section 11—601.

Plaintiffs discount Wallace's testimony that the Seaman truck was going 60 miles per hour or perhaps more by arguing that one cannot determine the rate of speed by a "quick glance," and because Wallace did not look again after the "quick glance," but instead simply accelerated. Moreover, Wallace never mentioned in his report to the investigating Macon County deputy sheriff that it appeared the Seaman vehicle was speeding.

Plaintiffs conclude that the uncontroverted evidence shows that Wilbur Seaman had the right-of-way based upon the relative position and speed of the vehicles as they approached the intersection, but realized the danger involved and took steps to avoid a collision. It was only decedent's braking which allowed Wallace to enter the intersection first. Plaintiffs feel that to allow such a verdict to stand would be contrary to policy concerns of promoting safety in the hazardous open intersection situation.

■ We disagree with plaintiffs and cannot say that the jury's decision was against the manifest weight of the evidence. A contrary conclusion is not clearly evident, plain, and indisputable. We note that the jury could have based its findings on the speed of the pickup truck, which defendant Wallace testified was going perhaps more than 60 miles per hour, or the possibility that the Seaman vehicle failed to keep a proper lookout (there was no indication of any braking until

176 feet before the intersection). The jury could also reasonably conclude that defendant Wallace did have the right-of-way, as there was evidence that Wallace thought he could pass the intersection before the Seaman vehicle entered the intersection. There was evidence that both sides were negligent to some extent and that the apportionment of fault was not against the manifest weight of the evidence.

Plaintiffs contend, incorrectly, that the determination of speed based on skid marks and damage is a matter outside the ken of the average juror and, absent expert testimony on scientific interpretation or reconstruction, the jury cannot make any factual determinations on speed. Plaintiffs cite two cases in support of this argument, neither of which supports the claim. (*Coffey v. Hancock* (1984), 122 Ill. App. 3d 442, 461 N.E.2d 64; *Finfrock v. Eaton Asphalt Co.* (1976), 41 Ill. App. 3d 1020, 355 N.E.2d 214.) *Coffey* and *Finfrock* deal only with the issue of when reconstruction testimony (seeking to recreate the accident using skid marks, debris, and damaged vehicles) and expert testimony may be presented in addition to eyewitness and circumstantial evidence. In fact, *Coffey* cites *Trillet v. Bachman* (1981), 96 Ill. App. 3d 477, 421 N.E.2d 580, which directly negates plaintiffs' assertion:

" 'Our supreme court has held that speed of an automobile is not a matter beyond the ken of an average juror and that jurors can draw their own conclusions on the basis of eyewitness testimony ***. [Citation.] In the instant case the plaintiff Mrs. Trillet observed the defendant's automobile twice, and she testified as to its speed and movement. The defendant testified as to the speed of his automobile at various points in its progress. *The jury also had before it physical facts as to length and placement of skid marks, and photographs of the damaged vehicles. With such evidence it was not beyond the ability of the jury to determine the speed of the vehicles.*' " (Emphasis added.) *Coffey*, 122 Ill. App. 3d at 447, 461 N.E.2d at 69, quoting *Trillet*, 96 Ill. App. 3d at 481, 421 N.E.2d at 583-84.

Plaintiffs also argue that the jury was not allowed to draw inferences on the speed of the Seaman vehicle based on the length of the skid marks and damage to the vehicles because of a motion *in limine* filed by plaintiffs and granted by the court. This is not true, however, as the court only prevented defense counsel from suggesting to the jury that the speed of the Seaman vehicle could be determined by the application of mathematical or scientific principles. The court went on to say that defense counsel could mention, and the jury could consider, what any layperson would understand: results from the colli-

sion, such as the damage to the vehicles; how far the vehicles were moved; and the fact that a long row of skid marks was left on the road.

## C. FAILURE TO AWARD DAMAGES FOR LOSS OF CONSORTIUM

Plaintiff Vickie Seaman contends on appeal that she is entitled to a new trial on the issues of damages for loss of consortium. Plaintiff believes the jury's verdict finding the defendants negligent but awarding her no damages was contrary to the finding by the jury that plaintiff sustained her burden of proof as to injury; and that the jury verdict awarding no damages was inconsistent, inadequate, and contrary to law.

 Courts are reluctant to interfere with the determination of a jury in awarding damages as long as the award is within the range of the evidence, the instructions proper, and there is no improper exclusion of evidence. (*Tipsword v. Johnson* (1978), 59 Ill. App. 3d 834, 836, 376 N.E.2d 85, 87.) A verdict should be examined to ascertain the intention of the jury in returning the verdict and, if the verdict is supportable, it will be molded into form and made to serve unless there is doubt as to its meaning. (*Manders v. Pulice* (1970), 44 Ill. 2d 511, 256 N.E.2d 330.) However, a court will intercede in the jury's assessment of damages when the award is palpably inadequate, or it is clear that proof of an element of damages has been ignored, or it is shown to be erroneous or the result of passion or prejudice, or it clearly appears from the uncontradicted evidence that the amount of the verdict bears no reasonable relationship to the loss suffered by the plaintiff. (*Tipsword*, 59 Ill. App. 3d at 834, 376 N.E.2d at 87.) We believe the jury's verdict is supportable because plaintiff failed to present evidence of damages.

 Plaintiff first contends that the jury's verdict was inadequate and contrary to law because, if the jury found defendants liable, it should have awarded damages. This is not necessarily true. The claim for consortium is a separate cause of action based upon the impaired spouse's claim for his own injury. (*Pease v. Ace Hardware Home Center of Round Lake No. 252c* (1986), 147 Ill. App. 3d 546, 498 N.E.2d 343.) To recover on a consortium claim, a party must prove liability on the part of defendant, marriage to the injured spouse, and damages. (*Pease*, 147 Ill. App. 3d at 556-57, 498 N.E.2d at 350.) Thus, although liability may have been proved, a plaintiff must still prove damages to recover.

Plaintiff next argues that assuming that the jury's finding was not inadequate and contrary to law, the record shows that such dam-

ages were proved. During trial, evidence was presented that Wilbur Seaman was hospitalized in a comatose state from the date of the accident, November 24, 1986, until his death on December 22, 1986. Plaintiff argues that there could be no clearer situation where a wife is deprived of the services of her husband and that no reasonable juror could conclude that plaintiff did not sustain damages for loss of consortium as a result of the negligent conduct of defendant.

We disagree. There is no presumption of injury to the rights of consortium of the wife arising from injury to the husband. (*Tjaden v. Moses* (1968), 94 Ill. App. 2d 361, 237 N.E.2d 562.) In *Tjaden*, the wife of plaintiff, who was severely and permanently injured, claimed loss of consortium. The only testimony presented concerning loss of consortium was that the husband and wife no longer danced or bowled and that the husband was rendered impotent. However, there was further testimony that the husband's impotence could have been psychogenic in nature. The trial court directed a verdict in favor of defendant on the loss of consortium claim because it believed that the evidence was insufficient to support a claim. This directed verdict was upheld on appeal.

A case in which a plaintiff proved damages for loss of consortium is *Pease*. In *Pease*, the jury found in favor of the husband on his personal injury claim and against the wife on her claim for loss of consortium. The appellate court in *Pease* first found that the wife had satisfied all of the requirements for a verdict in her favor as to liability, by proving defendant's liability to her husband, and that she had proved her marriage to her husband. The appellate court then went on to discuss the damages element and noted that the wife had proved the following at trial: (1) prior to his injury, the husband did various jobs around the home which he did not do after the injury; and (2) the couple engaged in sexual intercourse two or three times a week, but for seven months after the accident they did not engage in sexual intercourse at all and, at the time of the trial, they engaged in sexual intercourse once a week.

Here, plaintiff failed to present evidence of damage for loss of consortium while Wilbur Seaman lived. The only possible evidence of loss of consortium was Vickie Seaman's testimony that the marriage was happy and that they worked their problems out. We conclude this evidence was insufficient to support a claim for loss of consortium. The only other evidence which might support a loss of consortium claim was the previously quoted response to a question concerning Wilbur's activity with the children, wherein Vickie Seaman said they went, for example, camping and on family vacations to-

gether, and decedent helped the children with sports. There was, however, no claim for loss of companionship to the children for the 28 days that Wilbur Seaman lived. Moreover, the jury could have concluded that there would have been no camping between November 24, 1986, and December 22, 1986, a time when the weather is not ordinarily conducive to family camping with small children. There was no testimony of any plan to camp within that period of time. The jury's determination concerning the loss of consortium is thus supportable.

### D. COUNTERDEFENDANT'S CLAIM OF ENTITLEMENT TO NEW TRIAL

Plaintiffs' final issue on appeal is that plaintiff Vickie Seaman, counterdefendant as administrator of the estate, is entitled to a new trial on the counterclaim for contribution against Wilbur Seaman's estate. Plaintiff adopts the same arguments here as plaintiffs relied on under their first and second arguments, discussed under II, sections A and B. Because we do not grant a new trial as to the apportionment of the wrongful death, the survival, and loss of consortium actions, we do not grant plaintiff's request here.

Accordingly, the decision of the trial court is affirmed.

Affirmed.

KNECHT, P.J., and McCULLOUGH, J., concur.