HARRY L. WADE *et al.*, Plaintiffs-Appellees, v. THE CITY OF CHICAGO HEIGHTS, Defendant-Appellant.

First District (2nd Division)   No. 1—90—0467

Opinion filed June 28, 1991.

Antonietti & Gulotta, of Calumet City (Edward Antonietti and Ronald Kawanna, of counsel), for appellant.

Laser, Schostok, Kolman & Frank, of Chicago (Michael Lee Tinaglia, of counsel), for appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Jury verdicts of $3,582,627.70 in personal injury damages and of $904,166.67 in consortium damages, awarded to plaintiffs, Harry L. and Joann Wade, are challenged by defendant City of Chicago Heights (City). Harry's injuries were sustained when the automobile he was driving struck the side of a building. The accident allegedly was caused by the City's negligence in effecting street repairs.

The City claims error in the circuit court's rulings with regard to certain evidence, jury instructions and post-trial motions. For reasons which follow, we affirm in part, reverse in part and remand for a new trial.

The automobile accident occurred on 14th Street, between Arnold and Wentworth Avenues, in Chicago Heights, during the early morning hours of May 19, 1982. 14th Street is an east-west thoroughfare with two lanes running in each direction. It is also U.S. Route 30 and Lincoln Highway. Illuminated streetlights were located along the roadway and at the scene of the accident. Prior to May 19, 1982, a small section of road was under repair in the outer westbound lane of 14th Street, between Arnold and Wentworth Avenues. This was work undertaken by the Chicago Heights Water Department, some two weeks prior to May 19, 1982, in order to restore the water supply in that location. A three-foot rectangular hole, nine inches deep, was cut into the pavement in order to accomplish the repair. The hole was backfilled with gravel two to three inches higher than the pavement level to allow for settlement. Three barricades equipped with flashing lights were placed around the site; one each on the west side, south side and east side. Harry travelled this route every day to and from work and passed the City's construction site for approximately two weeks before the accident.

On May 18, 1982, Harry left his employment at the Ford Motor Company plant at the end of his shift. Harry reportedly went to a tavern on the day of the accident because of frustrations on the job, but had not gotten "drunk." Harry testified that he and a co-worker, Roy Nunn, went to Nunn's home in Gary, Indiana, to install an air conditioner there. The two men eventually watched videotapes of a boxing match, during which time Harry consumed two or three alcoholic drinks containing "brown whiskey."

Harry left Nunn's house for his own home between 2 and 3 a.m., driving to 14th Street in Chicago Heights. He travelled west in the outer lane at the legal speed limit of 45 miles per hour. After pass-

ing the Ford plant, Harry encountered nonrelated construction in the inner and outer westbound lanes, which then became single lanes in each direction. After 1½ miles, the construction ended, and Harry stopped for a stoplight at State and 14th. He could see the next stoplight down the road which marked the intersection of Wentworth and 14th, but saw no other lights. At the change of the lights at State Street, he proceeded west toward Wentworth. The next thing he recalled was waking up in St. James Hospital in Chicago Heights. He had sustained serious injuries to his head, nose, ears, mouth, and teeth, and his ability to stand and walk was impaired. Harry has received continued medical treatment since May 19, 1982, including psychiatric, dental, ophthalmological, and respiratory treatments. He saw his own family physician until 1987, when the Wades moved to Tennessee. There, to the time of trial, he saw both a psychiatrist and an allergist once per month.

Henry Rice, Jr., a City patrolman, investigated the accident. He found Harry unconscious in his car, abutting the east wall of a building on the northeast corner of 14th and Wentworth. Rice saw construction on 14th Street between Arnold and Wentworth, in the outer westbound lane, where a section of asphalt had been removed and had been filled in with gravel. Earlier on the day of the accident, Rice saw three lighted barricades surrounding the hole on its east, west and south sides. The barricades' battery-powered lights could be seen from one-half mile away or more. When he investigated the accident, however, all three were on the ground. The light on one barricade was still working.

Raymond Rossi, superintendent of the City's water department, was called as an adverse witness. In May 1982, the City did some repair work on 14th Street between Arnold and Wentworth to restore water service to one of the buildings. A hole was dug in the outer westbound lane to reach the affected pipe. The City undertook the construction when the State failed to do so. The hole was backfilled with gravel two to three inches above grade to allow for settlement before blacktopping. The backfilled hole was surrounded by barricades, which were lit at night by battery-powered lights and checked daily. No other warning devices were utilized. The department followed the law in barricading the hole, but Rossi did not know of Illinois Department of Transportation (IDOT) provisions relating to maintaining roadway construction.

A videotape of the evidentiary deposition of Thomas Cabello played to the jury revealed that, at the time of the accident, Cabello owned a cleaning and tailoring shop at 340 East 14th Street, over-

looking the scene. In May 1982, there was ongoing construction on 14th Street near his front window. A hole was there for "a couple of weeks or more" and was surrounded by three barricades. The barricade lights grew weaker each day. Cabello slept in the store on the night of the accident. At approximately 3:49 a.m., Cabello heard a crash, went to his front window and saw two of the three barricades on the ground. Only one of the three lights was still working, and it was dim.

Dr. Robert C. Watkins attended the Wade family from 1975 until they moved to Tennessee in 1987. Before the accident, Harry was physically and mentally fit and often served as Watkins' handyman. On May 19, 1982, in the emergency room at St. James Hospital, he saw Harry unconscious and unresponsive. Harry sustained a lacerated scalp and arm. A CAT scan revealed a contusion on the cerebral hemispheres which control thought and reasoning functions. These injuries were caused by "blunt head trauma." His thought processes were not intact, and he was unable to reason. Watkins' final diagnosis was a "right cerebral contusion" resulting in brain damage. Harry also suffered from a degenerated optic nerve, which affected his sight in his left eye. In Watkins' opinion, these injuries are permanent and would never improve. In the future, Harry would always require medical and psychiatric treatment, and he would never be able to work again. The City elicited evidence of Harry's indulgence in alcoholic beverages as contributory negligence that night, over plaintiffs' objection, through cross-examination of Dr. Watkins, which will be detailed later in the body of this opinion.

Joann and Marea Wade Foster, Harry and Joann's daughter, corroborated Harry's account of his relationship with the family both before and after the accident, tending to show a post-accident impairment in those relationships.

After submitting special expenses in evidence, plaintiffs rested. The City's motion for a finding was denied. The City rested without presenting evidence other than that developed on cross-examination. Plaintiffs' motion for judgment on the issue of liability was subsequently denied, and thereafter the court held a conference on instructions. During the conference, plaintiffs' motion to reopen their case to admit a mortality table was allowed over the City's objection, and counsel presented a chart to the jury which fixed Harry's life expectancy at 23.8 years.

As noted above, the jury returned a verdict in Harry's favor, in the amount of $4,320,583.33, but reduced it to $3,582,627.70, representing the jury's allocation of Harry's comparative negligence in the

amount of 17.08%. The jury also returned a verdict for loss of consortium in favor of Joann, in the amount of $904,166.67. Judgment was entered on the verdict on November 7, 1989.

On January 22, 1990, the circuit court denied the City's post-trial motion which alternatively sought judgment notwithstanding the verdict, a new trial or remittitur. On February 12, 1990, the City filed a timely notice of appeal, challenging the November 7, 1989, order entered upon the verdict and the January 22 order denying the post-trial motion.

## I

The City identifies as error the circuit court's refusal to give its instructions numbered 6, 7, and 8 in addition to the court's admonition to the jury to disregard all evidence relating to Harry's possible intoxication as contributory negligence.

■ Generally, each party has the right to have the jury instructed on its theory of the case, and the circuit court, in the exercise of its discretion, must instruct the jury on all issues which it finds have been raised and supported by the evidence presented. (*Marin v. American Meat Packing Co.* (1990), 204 Ill. App. 3d 302, 310, 562 N.E.2d 282; *Lounsbury v. Yorro* (1984), 124 Ill. App. 3d 745, 751, 464 N.E.2d 866.) A new trial will be granted where a party shows that its right to a fair trial has been seriously prejudiced by the denial of an instruction. *Alden Press, Inc. v. Block & Co.* (1988), 173 Ill. App. 3d 251, 260, 527 N.E.2d 489; see *Thompson v. Abbott Laboratories* (1990), 193 Ill. App. 3d 188, 200, 549 N.E.2d 1295.

At bar, the City claims to have elicited three facts, shown in the record, which warranted the giving of the refused instructions: (1) Harry previously that day had been drinking in a tavern; (2) Harry later had two to three drinks at Roy Nunn's house; and (3) a blood-alcohol concentration test performed on Harry at St. James Hospital demonstrated a 0.208 reading.

Considerable controversy and confusion concerning the blood-alcohol level test is evidenced in the record. First, it was represented to the circuit court and the jury by counsel for both sides that a "stipulation" had been entered between the parties' attorneys with respect to the "authenticity" of the hospital records and their "truth and accuracy." According to the colloquies between court and counsel (see later discussion and appendix), the blood-alcohol level test result was contained in the hospital records to which court and counsel referred and on which both parties relied. The "stipulation" also was relied upon by both parties. If ever reduced to writing, the stipulation

never was put in evidence or in the record on appeal. The hospital records themselves, although marked as plaintiffs' group exhibit No. 3, are not shown to have been offered or received in evidence either, and are not part of the record on appeal. A number of "off-the-record" sidebar conferences were held before and during the times references to the hospital records were made by both parties. Whether the "stipulation" then took place is not shown. This court, on review, is left to conjecture as to what court and counsel actually had before them except for the occasional oral references which were recorded and which are noted here. Significantly, the circuit judge never denied, corrected or otherwise challenged the existence or content of the claimed stipulation although counsel for each party at times disagreed as to its intent and content.

Since this case must be returned for a new trial, it is useful to review in some detail the procedure, arguments and rulings recorded so that errors may be avoided during future proceedings.

Harry's motion *in limine* sought to exclude any mention of his consumption of alcohol prior to the accident. Colloquies, in part, that took place between court and counsel with respect to Harry's drinking are located in an appendix at the end of this opinion. Particularly pertinent to the ensuing discussion, however, is the following discourse, which took place at a sidebar conference during the City's cross-examination of Dr. Watkins:

"[THE COURT:] *In addition, I am going to allow this as an adjunct to this other alcohol testimony to be brought out to the jury, also. I feel that there was enough evidence relating to the alcohol consumption issue for it to be presented to the jury, and that was based on the test which shows .208, plus his own testimony that he had two or three alcoholic drinks at the time he was visiting with Mr. Nunn.*

So I think there is enough in the predicate here to allow the cross-examiner, the adverse party, to go into that aspect of it. *This side bar can be treated as an offer of proof, and as I have viewed the evidence at this point, there is enough for it to go to the jury, assuming it goes in in that fashion.*

\* \* \*

[THE COURT:] \*\*\*

It's admitted by the parties here that Mr. Wade has previously testified in deposition form, I presume, or some statement, that he did consume alcohol that evening before the occurrence, and that alcohol was in the sum of two or three whiskey drinks or whatever; and together with the hospital

blood alcohol tests showing the .208, the Court feels there is sufficient alcoholic evidence here to form the basis for this now to be brought to the jury's attention and to be considered by them together with all the other facts and circumstances as to the negligence of the defendant and whatever that was the proximate cause of the injuries suffered by the plaintiff.

\* \* \*

MR. TINAGLIA: \*\*\* [T]he only way that the underlying information can be admitted is, one, if the witness bases his opinion on it. We don't have any statements at all about whether Dr.—we don't have Dr. Watkins saying anything about what his diagnosis was based on.

\* \* \*

[MR. TINAGLIA:] \*\*\* So the issue is can this doctor testify as to whether or not the guy was intoxicated, and how can he do that? You know, that's what my question is.

THE COURT: Very easily. Put the question to him and see whether, as a medical doctor, he has a medical opinion as to whether .208 is sufficient to cause intoxication. I am sure he's studied biology and chemical substance abuse.

\* \* \*

[THE COURT:] \*\*\*

So the court is going to overrule, if that is an objection, Mr. Tinaglia, *and allow counsel now to ask the doctor questions pertaining to the alcohol which appears in this report.*" (Emphasis added.)

After the ruling, the City's counsel resumed cross-examination of Dr. Watkins, asking him to examine the hospital records relating to Harry's activities before the accident. The following testimony was then given:

"A. [DR. WATKINS reading from Dr. Jensen's hospital history] 'Patient recalls leaving work and going to a tavern because of some frustration related to his job at the Ford Stamping Plant as a welder repairman. He states that he did not get drunk, but is amnesic to the events that transpired once he left the tavern.'

Q. [MR. ANTONIETTI City's counsel:] Doctor, in addition, were—when Mr. Wade was brought to the hospital, were certain other tests performed on Mr. Wade, one of which was a blood test?

A. Yes.

*  *  *

*Q. Can you look at that blood test and tell me whether or not that is a blood test which we have already stipulated to the authenticity of the records was done at St. James Hospital on Mr. Wade?*

A. *Yes.*

Q. And doctor, do you know what I mean when I say a blood alcohol level?

A. Yes.

Q. And can you tell the jury what is meant by blood alcohol level?

A. A blood alcohol level is a test that determines the level of alcohol in one's blood stream.

Q. Okay. Was such a test performed on Mr. Wade at the hospital?

A. Yes.

Q. And do you know what the results of that test were, doctor?

MR. TINAGLIA: Judge, I am going to object. The doctor has testified that he did not see that particular part of the hospital record, and counsel is not asking—." (Emphasis added.)

The court overruled the objection, and the City's counsel resumed:

"BY MR. ANTONIETTI:

Q. Do you know what that blood level was in Mr. Wade?

A. 208 [*sic*].

Q. And Dr. Watkins, are you aware or do you know what the legal limit of alcohol in blood level is in the State of Illinois for operating a motor vehicle?

MR. TINAGLIA: Objection, Your Honor. That question is irrelevant to these proceedings.

THE COURT: I will sustain the objection."

Although the question posed by the City's counsel may have been objectionable on various other grounds, at this stage of the proceedings, with the exchange between court and counsel concerning Harry's drinking of alcohol, Harry's testimony, the hospital reports, the medical testimony to that point concerning blood-alcohol concentration level, the City's previous assertion that it would be seeking a statutory instruction on the test reports, when considered together with the court's rulings concerning the introduction of evidence related to Harry's drinking, this last ruling sustaining plaintiffs' objection on relevancy grounds is difficult to comprehend. Section 11—

501.2(b)(3) of the Illinois Vehicle Code (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501.2(b)(3)) creates a statutory presumption that when the blood-alcohol level exceeds 0.10, as it apparently did in the present case, that person was under the influence of alcohol, which presumption is made applicable specifically "upon the trial of any civil or criminal action," and section 11—501(a)(1) prohibits a person from driving a vehicle in Illinois under such circumstances. Ill. Rev. Stat. 1987, ch. 95½, par. 11—501(a)(1).

The circuit court, in having allowed the jury to hear the evidence recounted above, now deprived the jury from considering the significance of that blood-alcohol level and its possible relationship to Harry's driving and the accident on the basis of a relevancy objection. Under analogous circumstances, in *Burris v. Madison County* (1987), 154 Ill. App. 3d 1064, 1069, 507 N.E.2d 1267, the court stated:

"[W]e find that it was error to exclude defendant's evidence regarding plaintiff's possible intoxication as well as the results of the blood test and the expert's interpretation of that result. Such evidence was relevant and material and its exclusion was highly prejudicial to defendant's case. This is especially true where the issue had already been broadly presented to the jury and several of plaintiff's witnesses had pointedly negated plaintiff's intoxication at the time of the accident. The admonition of the trial court to the jury to disregard any issue or evidence regarding plaintiff's drinking or intoxication would not, under the circumstances here, remove the prejudice to defendant's right to a fair trial."

During the instruction conference here, when the City's proffered instructions were debated, the circuit court noted, for some reason, that the test result testimony was ambiguous because only a bare "208" was mentioned, and there was no indication of whether it was .208 or 208. From the emphasized passages in the record set forth above and in the appendix which follows this opinion, counsel representing each of the parties, as well as the circuit judge himself, noted, argued and asserted that the blood-alcohol concentration shown in the hospital test report was 0.208. Nevertheless, ruling that there was a lack of connecting evidence on the issue of intoxication in addition to the fact that nobody had told the jury what the raw number "208" signified, the court refused all the instructions and struck all evidence concerning Harry's possible drinking as contributory negligence.

Should the circuit court have instructed the jury as to any effect alcohol may have had upon Harry's driving under the law, the facts and circumstances revealed by this record?

## A

The concept of *intoxication* has received considerable judicial attention. Our supreme court has held that "[w]hether or not a person is intoxicated is a question of fact for the jury, but what constitutes intoxication is a question of law to be defined by the court." (*People v. Schneider* (1936), 362 Ill. 478, 485, 200 N.E. 321.) After reviewing authorities from other States, the court went on to observe that the central idea of intoxication is "such an impairment of the faculties as to diminish the ability to manage the vehicle and impair the faculties of care and caution on the part of the driver." (*People v. Schneider*, 362 Ill. at 485.) In *Osborn v. Leuffgen* (1942), 381 Ill. 295, 299, 45 N.E.2d 622, the supreme court approved language appearing in *Elkin v. Buschner* (Pa. 1888), 16 A. 102, 104:

> "Whenever a man is under the influence of liquor so as not to be entirely at himself, he is intoxicated; although he can walk straight, although he may attend to his business, and may not give any outward and visible signs to the casual observer that he is drunk, yet if he is under the influence of liquor so as not to be at himself, so as to be excited from it, and not to possess that clearness of intellect and that control of himself that he otherwise would have, he is intoxicated." *Elkin v. Buschner*, 16 A. at 104.

Intoxication is the subject matter of two jury instructions. The first, Illinois Pattern Jury Instruction, Civil, No. 12.01 (2d ed. 1971) (hereinafter IPI Civil 2d), states as follows:

> "Whether or not a person involved in the occurrence was intoxicated at the time is a proper question for the jury to consider together with other facts and circumstances in evidence in determining whether or not he was [negligent] [or] [contributorily negligent]. Intoxication is no excuse for failure to act as a reasonably careful person would act. An intoxicated person is held to the same standard of care as a sober person."

The second, IPI Civil 2d No. 150.15, contains a definition of intoxication, to wit:

> "A person is 'intoxicated' when as a result of drinking alcoholic liquor there is an impairment of his mental or physical faculties so as to diminish his ability to think and act with ordinary care."

Although IPI Civil 2d No. 150.15 is contained within the section dealing with dramshop actions (Ill. Rev. Stat. 1987, ch. 43, par. 93.9 *et seq.*) (*e.g., Navarro v. Lerman* (1964), 48 Ill. App. 2d 27, 36, 198 N.E.2d 159), its use in automobile negligence cases has been accepted by courts in several cases. *E.g., French v. City of Springfield* (1972), 5 Ill. App. 3d 368, 376, 283 N.E.2d 18; *Patarozzi v. Prairie States Oil & Grease Co.* (1966), 71 Ill. App. 2d 155, 159, 218 N.E.2d 113. *Cf. Bohnen v. Wingereid* (1979), 80 Ill. App. 3d 232, 238, 398 N.E.2d 1204.

■ Recognizing that "intoxicated" might well have become a prejudicial "buzz" word, cases in Illinois subscribe to the proposition that evidence of mere "drinking" may not be equated with "intoxication" itself, nor can the intake of alcoholic liquor, standing alone, be used to characterize a person as "intoxicated." (*E.g., Shore v. Turman* (1965), 63 Ill. App. 2d 315, 210 N.E.2d 232.) To prove intoxication, the evidence must establish that the putatively intoxicated person not only consumed alcoholic liquor, but also displayed some form of unusual behavior, or there must be opinion evidence, from which the trier of fact may reasonably conclude that the subject person was intoxicated at the critical time. (*Young v. Gateway Transportation Co.* (1975), 26 Ill. App. 3d 864, 873, 326 N.E.2d 222.) Evidence admissible in this regard was considered in *Shore v. Turman* (63 Ill. App. 2d at 323):

"In addition, there must be an impairment of mental and physical faculties with the resultant diminution in the ability to think and act with ordinary care. *** [There must be] some act, action, conduct, appearance, observation, or circumstance shown by the evidence to point squarely to the conclusion, either directly or by reasonable inference, that the conduct of the individual at and before the accident was or may have been affected by the use of alcoholic beverages."

See also *Clay v. McCarthy* (1979), 73 Ill. App. 3d 462, 466, 392 N.E.2d 693.

■ The circuit court in the case at bar had allowed evidence of Harry's drinking of alcoholic liquor to be presented to the jury; as to conduct, however, there were no witnesses with respect to Harry's driving before or at the time of the accident. Nor were there any witnesses to the accident itself. The only circumstantial evidence of possible intoxication was conjectural: that Harry's automobile went out of control before or after it struck the three barricades and the building. Depending upon witnesses' testimony, two of the barricades may or may not have been illuminated by warning lights; and the

third may or may not have been equipped with a light which was or was not visible. The absence of adequate warning lights could have been the proximate cause of the accident, rather than Harry's possible intoxication. The court was possessed of discretion as to whether the jury should have been allowed to consider Harry's asserted intoxicated condition and declined to do so on this evidence of conduct or lack thereof. See *Young v. Gateway Transportation Co.*, 26 Ill. App. 3d at 873.

Further, the blood-alcohol concentration hospital test of Harry's specimen revealed a reading of 0.208, according to court and counsel, as set forth above. The absence of opinion testimony with respect to whether such a level was equivalent to "intoxication," considering Harry's age, build, his physical propensities and sensitivities to alcohol, his body's capacity to absorb, metabolize and eliminate alcohol and over what period of time, and food previously ingested among other possible factors, left the court with a serious question as to admissibility. The City's cross-examination of Dr. Watkins ended abruptly in this phase of the case. The jury was left thereby without guidance as to the relationship, if any, between the test results and the question of Harry's *intoxication.*

Under the foregoing circumstances, the circuit court did not err by refusing the City's instruction No. 6, which embodied IPI Civil 2d No. 12.01, dealing with *intoxication* as negligence.

## B

The question of whether Harry was driving in violation of statute, however, is another matter. The City sought to prove, and to have the jury instructed, that Harry, when driving his automobile, possessed a blood-alcohol concentration level of 0.208, which was in violation of Illinois Vehicle Code sections 11—501(a)(1) and 11—501.2(b)(3). Ill. Rev. Stat. 1987, ch. 95½, pars. 11—501(a)(1), 11—501.2(b)(3).

Sections 11—501(a)(1) and (a)(2) (Ill. Rev. Stat. 1987, ch. 95½, pars. 11—501(a)(1), (a)(2)) provide, in pertinent part:

"§11—501. Driving while under the influence of alcohol, other drug, or combination thereof. (a) A person shall not drive or be in actual physical control of any vehicle within this State while:

1. The alcohol concentration in such person's blood or breath is 0.10 or more based on the definition of blood and breath units in Section 11—501.2;

2. Under the influence of alcohol."

Section 11—501.2(b)(3) (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501.2(b)(3)) provides:

> "(b) Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a vehicle while under the influence of alcohol, the concentration of alcohol in the person's blood or breath at the time alleged as shown by analysis of the person's blood, urine, breath, or other bodily substance shall give rise to the following presumptions:
>
>        \* \* \*
>
> 3. If there was at that time an alcohol concentration of 0.10 or more, it shall be presumed that the person was under the influence of alcohol."

The City's proposed instruction No. 7 essentially repeated the provisions of IPI Civil 2d No. 60.01 as modified by the inclusion of section 11—501(a)(1) language. In pertinent part, IPI Civil 2d 60.01 instructs the jury:

> "If you decide that [a party] [the parties] violated the [statute] [ordinance] on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not [a party] [the parties] [was] [were] [contributorily] negligent before and at the time of the occurrence."

The City's proposed instruction No. 8 reflected the language of IPI Civil 2d No. 60.01 and contained the section 11—501.2(b)(3) presumption. For some reason, the City neglected to include section 11—501(a)(2) in either its proposed instructions Nos. 7 or 8, which proscribes driving while under the influence of alcohol. The statutory presumption of driving under the influence of alcohol provided in section 11—501.2(b)(3) was thereby left unconnected with a violation provision. These provisions will be further analyzed later in this opinion. For present purposes it is significant that neither sections 11—501(a)(1), (a)(2) nor section 11—501.2(b)(3) contains references to *intoxication*. Section 11—501.2(b)(3) refers only to *driving under the influence of alcohol*. Whether a vehicle operator is *intoxicated* is not the issue here: the legislature has made driving with that blood-alcohol concentration *illegal*, whether the driver is intoxicated or not.

The supreme court has held that the violation of a statute "designed for the protection of human life or property is *prima facie* evidence of negligence." (*Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 390, 356 N.E.2d 93; see also *French v. City of Springfield*

(1976), 65 Ill. 2d 74, 79, 357 N.E.2d 438; *Dini v. Naiditch* (1960), 20 Ill. 2d 406, 417, 170 N.E.2d 881.) The court in *Davis* delineated the status of an asserted violation, in which IPI Civil 2d No. 60.01 might apply, as follows (*Davis v. Marathon Oil Co.*, 64 Ill. 2d at 390):

"Violation does not constitute negligence *per se*, however, for the evidence of negligence may be rebutted by proof that the party acted reasonably under the circumstances, despite the violation. (*Johnson v. Pendergast* (1923), 308 Ill. 255, 262-65.) And proven negligence results in liability only when the injury was proximately caused by the violation. (*Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 79.) The party requesting instruction No. 60.01 must also demonstrate that the statute or ordinance was intended to protect against the injury incurred, and that the injured party is within the class intended to be protected. *Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 76-78; *Brunnworth v. Kerens-Donnewald Coal Co.* (1913), 260 Ill. 202, 216-17."

There can be little doubt in the case *sub judice* that sections 11—501(a)(1) and 11—501.2(b)(3) were "designed for the protection of human life or property" (*Davis v. Marathon Oil Co.*, 64 Ill. 2d at 390), as part of the Vehicle Code "Rules of the Road." (Ill. Rev. Stat. 1987, ch. 95½, par. 11—100 *et seq.*) The use of IPI Civil 2d No. 60.01 has been approved in a variety of circumstances showing the alleged violations of other "Rules of the Road" as *prima facie* evidence of negligence and potential proximate causes of occurrences, traditionally jury questions. For example, in *Seaman v. Wallace* (1990), 204 Ill. App. 3d 619, 561 N.E.2d 1324, "Rules of the Road" right-of-way provisions (Ill. Rev. Stat. 1987, ch. 95½, par. 11—901(b)), embodied in an IPI Civil 2d No. 60.01 instruction, were properly presented to a jury in determining the proximate cause of an intersection accident. In *Schultz v. Siddens* (1989), 191 Ill. App. 3d 622, 548 N.E.2d 87, a jury properly would have been instructed if allowed to consider the operation of a farm tractor on a highway in contravention of the "Rules of the Road" (Ill. Rev. Stat. 1987, ch. 95½, par. 11—1418), as a potential danger to safe movement of other traffic on the highway. In *Amstar Corp. v. Aurora Fast Freight* (1986), 141 Ill. App. 3d 705, 490 N.E.2d 1067, a jury was properly instructed that traffic violations of the statutory prohibition against standing, stopping or parking on a controlled access highway (Ill. Rev. Stat. 1983, ch. 95½, par. 11—1303(1)(j)) could be considered *prima facie* evidence of negligence, as could violations of the rule prohibiting starting a vehicle which is stopped, standing or parked unless and until such movement can be made with reasonable safety (Ill. Rev. Stat. 1983, ch.

95½, par. 11—803) and the rule requiring vehicles moving at less than normal speed to be driven as close as possible to the righthand edge of such a road (Ill. Rev. Stat. 1983, ch. 95½, par. 11—701(b)). Instructions concerning violation of speed laws and improper turning regulations (Ill. Rev. Stat. 1979, pars. 11—601(a), 11—902) were also properly given in IPI Civil 2d No. 60.01 instructions to a jury as *prima facie* evidence of negligence if in violation of statute, as found in *Kosch v. Monroe* (1982), 104 Ill. App. 3d 1085, 433 N.E.2d 1062. Other examples abound.[1] No persuasive reasons were advanced or are perceived as to why violations of standing, stopping, parking, turning, right-of-way or speed control statutes are more amenable to jury instructions than the physical and mental condition of the driver while operating the vehicle.

The City's proposed instruction No. 8, IPI Civil 2d No. 60.01, embodying section 11—501.2(b)(3), is ordinarily to be used in conjunction with section 11—501(a)(2) violations. Standing by itself, section 11—501.2(b)(3) is definitional (*People v. Ziltz* (1983), 98 Ill. 2d 38, 43, 455 N.E.2d 70) and is not amenable to a charge of violation, which is provided in section 11—501(a)(2). The reason given by the circuit court here, however, for refusing to give IPI Civil 2d 60.01 instructions containing section 11—501(a)(1) and section 11—501.2(b)(3) language was that no expert was produced by the City to explain the meaning of a 0.208 blood-alcohol concentration reading and that this was a "raw" figure without significance to a jury. The City's requested instruction No. 7 here sought a jury decision on whether section 11—501(a)(1) was violated, however, not the ultimate conclusion of whether Harry was either intoxicated or driving under the influence of alcohol. The statutory language itself in section 11—501(a)(1) readily tells every motorist, court and jury simply and forcefully that one is prohibited from driving a vehicle on an Illinois road when his or her blood-alcohol concentration has reached .10% or more. This alleged violation stands as a statutory offense separate from driving under the influence prohibited in section 11—501(a)(2) (*People v. Ziltz*, 98 Ill. 2d at 43), and separate from driving while intoxicated. Section 11—501(a)(1) does away with any need for evidence of impairment.

The City's proposed instruction No. 8 would have been proper had it been used together with or in reference to section 11—

---

[1]Also to be noted is the prohibition against an operator driving a vehicle for excessive periods of time, in certain cases, an obvious concern for driver fatigue, sleepiness and like circumstances. Ill. Rev. Stat. 1989, 95½, par. 11—1419.

501(a)(2), and was properly refused, albeit for the wrong reason. Anticipating the probable request for such an instruction upon retrial, we consider next the differences between intoxication and driving under the influence of alcohol.

Although one who is intoxicated can be said to be under the influence of alcohol, the converse is not necessarily true: one may be under the influence of alcohol in varying degrees (*Snyder v. City & County of Denver* (1951), 123 Colo. 222, 227, 227 P.2d 341, 343; see also *State v. Johnson* (1964), 42 N.J. 146, 199 A.2d 809, 819; *State v. Sisneros* (1938), 42 N.M. 500, 506, 82 P.2d 274, 278) without necessarily being considered intoxicated. (*E.g., Cannon v. State* (1926), 91 Fla. 214, 217, 107 So. 360, 362; *Shorter v. State* (1954), 234 Ind. 1, 9-10, 122 N.E.2d 847, 850; *State v. Bryce* (Me. 1968), 243 A.2d 726, 729; *State v. Hanson* (N.D. 1955), 73 N.W.2d 135, 139; *State v. Noble* (1926), 119 Or. 674, 677, 250 P. 833, 834; Annot., 52 A.L.R.2d 1329 (1957); 7A Am. Jur. 2d *Automobiles and Highway Traffic* §302 (1980). *Cf. State v. Davis* (Iowa 1972), 196 N.W.2d 885, 890; *State v. Dudley* (1925), 159 La. 872, 106 So. 364; *State v. Cox* (Mo. 1972), 478 S.W.2d 339, 342; *Uldrich v. State* (1956), 162 Neb. 746, 754, 77 N.W.2d 305, 309; *Jones v. State* (1937), 132 Tex. Crim. App. 445, 446, 104 S.W.2d 871, 872; *Maedgen v. State* (1937), 132 Tex. Crim. App. 397, 401, 104 S.W.2d 518, 520.) As previously noted, neither section 11—501 nor section 11—501.2 employs the term "intoxicated." Nor is the concept of being under the influence anywhere statutorily equated with being intoxicated. Proof of intoxication was not necessary here; only proof that Harry was driving a motor vehicle while possessing the proscribed blood-alcohol content level. The circuit court and the City confused the two terms; however, plaintiffs correctly recognized the distinction to be made between *intoxication* and *driving under the influence of alcohol*, when they noted in their brief that the court in *Cairns v. Hansen* (1988), 170 Ill. App. 3d 505, 511, 524 N.E.2d 939, "unfortunate[ly]" used the terms interchangeably, "because these phrases are not synonymous."

As noted by authorities set forth above and those later cited and quoted in this opinion, the selection of 0.10 blood-alcohol concentration is a scientifically based evidentiary level which dispenses with the need for expert interpretation or evidence of unusual conduct. Antecedents of sections 11—501(a)(1), (a)(2) and 11—501.2(b)(3) are found in a number of sources. Similar provisions, for example, were debated by the 85th United States Congress in 1957 when considering the weight to be given to evidence of blood-alcohol tests for persons tried in the District of Columbia for operating vehicles while un-

der the influence of intoxicating liquor. United States Senate Report No. 460 made the observation that a statute prescribing statutory presumptions (similar to those in Illinois) would

"allow the District *to dispense with the services of an expert witness to interpret the results* of a chemical analysis of the blood or urine of persons charged with such an offense." (Emphasis added.) (S. Rep. No. 460, 85th Cong., 1st Sess. 2 (1957).)

The report noted further that such a presumption would

"make it possible for the trials of persons charged with operating under the influence of intoxicating liquor to be conducted more efficiently, with less likelihood of delay, *by substituting certain statutory presumptions for the usual (and standardized) explanation* that is presently given by the expert witness in each such case."[2] (Emphasis added.) (S. Rep. No. 460, 85th Cong., 1st Sess. 2 (1957).)

United States House of Representatives Report No. 1202 made a similar observation:

"This legislation, if enacted, *will simply make it unnecessary to call an expert witness to testify in each individual case.* Instead it would substitute the tests set forth in this bill.

Twenty-four States have now [1957] adopted chemical test laws in some form or another. A list of these States is set out below: Arizona, Arkansas, Delaware, Georgia, Idaho, Indiana, Kansas, Kentucky, Maine, Minnesota, Nebraska, New Hampshire, New Jersey, New York, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, Utah, Virginia, West Virginia, Wisconsin, Wyoming." (Emphasis added.) H.R. Rep. No. 1202, 85th Cong., 1st Sess. 3 (1957).

Of the States which have enacted statutes containing similar language, expert testimony to interpret the blood-alcohol concentration results was not a prerequisite. In *Tuseth v. Thoreson, Inc.* (Minn. 1979), 287 N.W.2d 633, 635, the Minnesota Supreme Court stated:

"After the conclusion of testimony the trial court instructed the jury that it is unlawful to operate a motor vehicle in this state when the operator's blood contains 0.10 percent or more

---

[2]The National Committee on Uniform Traffic Laws and Ordinances published its model statute on the subject beginning in 1971; its most recent edition in 1987 reveals that model sections 11—902 and 11—903 are substantially similar to sections 11—501 and 11—501.2 of the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, pars. 11—501, 11—501.2).

by weight of alcohol. He further told them that a violation of that provision constituted prima facie evidence of negligence.

There was no error. Minn. Stat. ch. 169 (1978) assigns an evidentiary significance to blood alcohol test results of 0.10 or greater. Minn. Stat. §169.121, subd. 1(d) (1978) provides that it is unlawful to operate a motor vehicle '[w]hen the person's alcohol concentration is 0.10 or more.' Minn. Stat. §169.96 (1978) then provides that any violation of chapter 169 constitutes prima facie evidence of negligence. The admission of the 0.20 percent result of the blood analysis, therefore, was relevant, indeed necessary, to establish a violation of §169.121, subd. 1(d), and to thereby obtain the benefit of the prima facie evidence provision of §169.96. *No expert interpretation is necessary for the admission of a test result of 0.10 or greater. The admission of such evidence and the instructions with regard thereto are sanctioned by statute and were wholly proper.*" (Emphasis added.)

In *Divine v. Groshong* (1984), 235 Kan. 127, 138, 679 P.2d 700, 709, where no interpretive testimony by an expert was given as to the effect of the blood-alcohol level found in that case, the Kansas Supreme Court held:

"The statute was again amended in 1982 and now appears as K.S.A. 8—1005. Subsection (a)(2) of that statute makes it prima facie evidence that one was under the influence of alcohol *to a degree that renders a person incapable of driving safely if blood, urine, breath or other bodily substance tests disclose 0.10% or more by weight of alcohol in the blood.* Thus, the same presumption adopted in 1970 continues. No presumption arises if the percentage is less than 0.10%. *The statutory presumption is based upon scientific principles.* It would not be logical to have a presumption, based upon a given set of facts, that one was under the influence of alcohol to a degree that renders the person incapable of driving safely, in a criminal case but not in a civil case. *The presumption is one arising upon certain facts and if those facts are shown by the evidence in either a civil or criminal case, the same presumption should arise. The presumption is a rule of evidence, applicable in civil, criminal or administrative proceedings.* We hold that there is a rebuttable presumption in this state that a driver who at the time of an accident has 0.10% or more by weight of alcohol in his or her blood is under the influence of alcohol.

The trial court did not err in so instructing the jury." (Emphasis added.)

In *Gibson v. Boyle* (1983), 139 Ariz. 512, 520, 679 P.2d 535, 543, in the absence of interpretive expert testimony, the court held:

"Another important issue litigated at trial was whether Kelly Boyle was driving while under the influence of intoxicating liquor at the time of the fatal collision. Appellants presented evidence that Kelly Boyle's blood alcohol level, at the time of his death, was .17%. A.R.S. §28—692 makes it unlawful for a person to drive a motor vehicle within the state while under the influence of intoxicating liquor. A person with a blood alcohol level of .10% or greater is rebuttably presumed to be under the influence."

Much reliance was placed upon several Illinois cases by plaintiffs and the circuit court in the case *sub judice*, particularly *Lively v. Kostoff* (1988), 167 Ill. App. 3d 384, 521 N.E.2d 554, for the proposition that proof of intoxication requires proof of drinking, erratic conduct or expert opinion. Although the court there mentions a blood-alcohol test to be interpreted by an expert to prove *intoxication*, it does not discuss the need for expert testimony in cases involving violations of sections 11—501(a)(1), (a)(2), or 11—501.2(b)(3) (Ill. Rev. Stat. 1987, ch. 95½, pars. 11—501(a)(1), (a)(2), 11—501.2(b)(3)). The *Lively* opinion cites and relies upon *Burris v. Madison County* (154 Ill. App. 3d at 1069) and *Thomas v. Brandt* (1986), 144 Ill. App. 3d 95, 101, 493 N.E.2d 1142. Both *Burris* and *Thomas* were concerned with proof of *intoxication*, rather than the violation of sections 11—501(a)(1) and 11—501.2(b)(3) as *prima facie* evidence of negligence. Little support for plaintiffs is found in *French v. City of Springfield* (5 Ill. App. 3d 368), upon which they also rely. There, the court also dealt with evidence of intoxication, not the violation of statute as *prima facie* evidence of negligence under IPI Civil 60.01 as here. In *Young v. Gateway Transportation Co.* (1975), 26 Ill. App. 3d 864, cited by plaintiffs, the issue raised and decided by the court was intoxication, rather than a statutory violation. The same is true of *Doria v. Costello* (1974), 22 Ill. App. 3d 505, 510-12, 318 N.E.2d 40, in which the court deemed intoxication as the appropriate object of IPI Civil 2d Nos. 12.01 and 150.15, but did not have before it IPI Civil 2d No. 60.01 applying sections 11—501(a)(1) and 11—501.2(b)(3), as have been presented in the instant case.

Plaintiffs assert that an instruction in a civil case which permits a presumption that the drinker was "under the influence of alcohol" would contradict Illinois decisional law on the admissibility of alcohol

evidence. Plaintiffs cite no case factually analogous to the present case on the issues of (1) a statutory prohibition against driving a vehicle on an Illinois road when the operator possesses a blood-alcohol concentration level of 0.10 or more (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501(a)(1); (2) a statutory presumption of driving "under the influence of alcohol" when such a level is found (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501.2(b)(3)); and (3) a party has sought an IPI Civil 2d No. 60.01 instruction allowing a jury to consider whether such statutory violations have occurred and, if so, consider those violations as *prima facie* evidence of negligence. There is no contradiction without a postulate.

Evidence of guilt no doubt will be prejudicial here, as it is in every case charging a person with wrongdoing; so will evidence of running a stop light, driving on the wrong side of the road, making an improper turn and violating any one of the "Rules of the Road." No reason is presented as to why a driver who exceeds Vehicle Code speed limit laws should be required to endure such a prejudicial procedure but one who violates Vehicle Code statutory alcohol limit laws must not. (See *People v. Ziltz*, 98 Ill. 2d at 43.) To the contrary, the injury, crippling or death attributable to such excesses, as a jury may find in the case *sub judice*, are the same whether caused by a driver having pushed the accelerator "pedal to the metal" or by one having downed "one too many."

The City's instruction No. 7 should have been given to the jury; failure to have done so was error requiring reversal and remandment for a new trial.

## II

■ The City next contends that the circuit court erred in submitting plaintiffs' instruction No. 29 to the jury. This instruction, based upon IPI Civil 2d No. 60.01, incorporated certain IDOT regulations for maintaining construction sites on road and streets.

Although IPI Civil 2d No. 60.01 pertains to violations of statutes or ordinances, administrative rules, regulations, and orders designed to protect human life or property may also be used in conjunction with the instruction. (*Davis v. Marathon Oil Co.*, 64 Ill. 2d at 390.) Section 11—301 of the Vehicle Code contains the legislature's directive to IDOT to "adopt a State manual and specifications for a uniform system of traffic-control devices consistent with this Chapter for use upon highways within this State." (Ill. Rev. Stat. 1987, ch. 95½, par. 11—301.) Rules adopted by an administrative agency pursuant to a grant of statutory authority have the force of law. (*De-*

*partment of Corrections v. Illinois Civil Service Comm'n* (1989), 187 Ill. App. 3d 304, 308, 543 N.E.2d 190.) The regulations at issue here, which concern warning motorists approaching construction work in the roadways, clearly were designed to protect human life or property and fulfill the *Davis* criteria for submission to the jury.

The City contends that no evidence was presented to establish that the City had failed to meet the regulations, relying on *Figarelli v. Ihde* (1976), 39 Ill. App. 3d 1023, 351 N.E.3d 624. The regulation submitted at bar provides that "[m]otorists should be guided in a clear and positive manner while approaching and traversing construction and maintenance work areas." It goes on to state:

> "Adequate warning, delineation and channelization by means of proper pavement marking, signing, and use of other devices which are effective under varying conditions of light and weather should be provided to assure the motorist of positive guidance in advance of and through the work area."

The City argues that the regulation does not mandate what types of warnings, delineation or channelization should be provided. Further, it claims an absence of any evidence or testimony by an expert as to what actions the City failed to take with respect to guiding motorists around the backfilled excavation or that the barricades or warnings it did provide did not meet the IDOT guidelines. Therefore, this court should find that the circuit court erred in submitting an instruction which permitted the jury to consider a failure to warn or barricade as a violation of this regulation.[3]

There are serious questions as to which "marking, signing and use of other devices" should have been provided at the place of this accident. Which "varying conditions of light and weather" should have been considered at the subject site, but were not? Were the provided barricades sufficient in number, correct in type, strategically placed, and adequately lighted under the "varying conditions of light and weather" here? Do the same "regulations" apply to four-lane highways, such as this one, or two-lane highways? Does such repair

---

[3]The City argues for the first time in its reply brief that the Tort Immunity Act precludes plaintiffs' recovery for failure to warn. Plaintiffs have moved to strike these arguments, and this court has taken the motion with briefs. The City's argument is waived. (134 Ill. 2d R. 341(e)(7).) The City's failure to either raise the Tort Immunity Act in its answer or amended answer or argue it before the circuit court, precludes consideration of this issue on appeal. *Board of Education of Township High School District No. 211 v. Kusper* (1982), 92 Ill. 2d 333, 342-43, 442 N.E.2d 179; *United States Fidelity & Guaranty Co. v. Specialty Coatings Co.* (1989), 180 Ill. App. 3d 378, 383, 535 N.E.2d 1071.

work in the outer or curb lane, as here, require "channelization" under the present facts, such as "pavement markings, signing or other devices" and, if so, what kinds of markings, signing or devices? Would any purposes be served by "channelization" at all under these facts? The foregoing questions were submitted, in effect, to the jury without any guidance from any witness as to how the IDOT standards applied to the subject site, or some of them, or none of them. The circuit judge expressed his own reservations at the instruction conference when he said:

"THE COURT: I'm giving plaintiff the opportunity to set forth the channelization, the signing and so forth and so on. I'm not going to elaborate on the illumination. I have some reservations about whether this instruction should even be given absent some expert or some person knowledgeable about the IDOT regulations and their application to this particular scene."

Considering this state of the evidence, the circuit court erred in giving plaintiffs' instruction No. 29, an additional reason requiring reversal and remandment for a new trial.

### III

■ The City identifies another circuit court error in allowing plaintiffs to reopen their case to introduce into evidence a mortality table, relating to Harry's life expectancy.

Reopening a case for further proofs is within the circuit court's discretion and will not be overturned by a reviewing court absent a clear abuse. (*Crothers v. La Salle Institute* (1977), 68 Ill. 2d 399, 408, 370 N.E.2d 213; *Hollembaek v. Dominick's Finer Foods, Inc.* (1985), 137 Ill. App. 3d 773, 778, 484 N.E.2d 1237.) In considering a motion to reopen proofs, the circuit court should weigh various factors, including whether (1) the failure to introduce the evidence occurred because of inadvertence or calculated risk; (2) the adverse party will be surprised or unfairly prejudiced by the new evidence; (3) the new evidence is of the utmost importance to the movant's case; and (4) any cogent reasons exist to justify denying the request. *United States Department of Housing & Urban Development v. Anderson* (1988), 178 Ill. App. 3d 752, 755, 533 N.E.2d 919; *Hollembaek v. Dominick's Finer Foods*, 137 Ill. App. 3d at 778.

■ Plaintiffs' failure here to introduce a mortality table appears to have been caused by inadvertence. The City cannot claim surprise since Dr. Watkins testified as to Harry's ability to work, as well as his need of future psychiatric and medical treatment. The mortality

table was of the utmost importance to plaintiffs' case, and no cogent reasons exist in the record to justify the denial of the request. There was no error in this regard. See *Gilliam v. Agar Packing Co.* (1966), 67 Ill. App. 2d 235, 216 N.E.2d 504 (abstract of opinion) (reopening proofs in order to admit mortality table not error).

## IV
■ The City next challenges as reversible error the submission to the jury of plaintiffs' instruction No. 19, which authorized the jury to award Harry "the present cash value of the reasonable expenses of medical care, treatment and services reasonably certain to be received in the future." The City insists that Harry failed to establish the necessary foundation for a claim of future medical expenses. We have reviewed the extensive evidence of Harry's injuries, the medical care he had received to date of trial and the cost of such care and find that the City's contention is totally without merit. See *Long v. Friesland* (1988), 178 Ill. App. 3d 42, 58, 532 N.E.2d 914.

## V
The City next alleges that the circuit court erred by not granting its motion for remittitur. In view of our disposition with regard to the previous issues raised, there is no necessity to consider this issue.

## VI
The City's final contention is that the circuit court erred when it denied its motion for judgment notwithstanding the verdict.
■ A court may grant a motion for judgment notwithstanding the verdict only when all the evidence, viewed in a manner most favorable to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504; *McKanna v. Duo-Fast Corp.* (1987), 161 Ill. App. 3d 518, 527, 515 N.E.2d 157; see also *Derrico v. Clark Equipment Co.* (1980), 91 Ill. App. 3d 4, 8, 413 N.E.2d 1345; *Reynolds v. American Oil Co.* (1975), 32 Ill. App. 3d 905, 912, 337 N.E.2d 403; *Friesland v. City of Litchfield* (1960), 24 Ill. App. 2d 390, 395, 164 N.E.2d 606.) Judgment notwithstanding the verdict is improper where reasonable minds may differ as to inferences or conclusions to be drawn from facts presented. (*Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 510, 492 N.E.2d 1364.) Where evidence demonstrates a substantial factual dispute, or where assessment of wit-

nesses' credibility or resolution of conflicting evidence may determine the outcome, a court errs in directing a verdict or entering judgment notwithstanding the verdict. *Lee v. Grand Trunk Western R.R. Co.*, 143 Ill. App. 3d at 509; *Graves v. Wornson* (1978), 56 Ill. App. 3d 873, 877, 371 N.E.2d 692; *Wolfe v. Whipple* (1969), 112 Ill. App. 2d 255, 262, 251 N.E.2d 77.

In the instant case, plaintiffs alleged negligence. The essential elements sounding in negligence are the existence of a duty of reasonable care owed plaintiff by defendant, breach of that duty and injury proximately resulting from that breach. (*Magnone v. Chicago & North Western Transportation Co.* (1984), 126 Ill. App. 3d 170, 176, 466 N.E.2d 1261; *Johnson v. Burlington Northern, Inc.* (1982), 107 Ill. App. 3d 130, 437 N.E.2d 334.) The City does not challenge the existence of the duty owed to plaintiffs, but rather maintains that the evidence does not show that it proximately caused Harry's injuries. The evidence, however, reveals that Harry's accident could have been proximately caused by his vehicle's coming into contact with the backfilled hole in the alleged manner, to an extent authorizing the submission of the question to the jury.

For the reasons stated above, we reverse and remand for a new trial consistent with the views expressed in this opinion.

Affirmed in part; reversed in part and remanded for a new trial with directions.

DiVITO and COCCIA, JJ., concur.

### APPENDIX

(Colloquy between court and counsel regarding evidence related to Harry's indulgence in drinking intoxicating liquor.)

"MR. TINAGLIA: All right. *Judge, the lab report shows a blood alcohol value of .208. And that is contained in the St. James Hospital Medical records.* Our motion is based on the following: Number one, Mr. Wade's testimony, or if you want to characterize it as an admission, that he had two drinks, standing alone should not be admitted. \*\*\* The issue is whether he was intoxicated.

\*\*\* I do not believe that the defendant can establish by good and competent evidence that Mr. Wade was intoxicated.

\* \* \*

MR. ANTONIETTI: Judge, just briefly. Number one, I think that the issue of alcohol is brought in here because of

the testimony of the plaintiff, nobody else. He said that he had been to a friend's house and that he had been drinking brown whiskey.

\* \* \*

\*\*\* [T]he fact of the matter is that he had been drinking admittedly by his own testimony at his friend's house, he got off work at 11:30 that night, and the accident happened approximately 4:15 the next morning.

*There is evidence in the medical records that the blood test was a .2, which is twice the legal limit for alcohol in the state.* \*\*\* *[W]e would be entitled to a statutory instruction on that.*

In addition, Judge, in the medical records there's a report from Dr. Jensen, who was also a treating doctor of the plaintiff, who said that in his history that he took, that the plaintiff told him that he had gone from work to a tavern, and that he stayed at the tavern until the time that he left the tavern until the time of the accident. All that together alongwith [sic] the bizarre circumstances of this accident, Judge, I think certainly raises an issue that the jury is entitled to consider with regard to a contributing factor to the accident.

\* \* \*

THE COURT: \*\*\* The issue at hand is whether alcohol should be presented to the jury. Considering the volatility of alcohol in the minds of laypersons, certainly it would have a prejudice affect [sic] if there's no bases or predicate for alleging and claiming that the plaintiff was under the influence because of alcoholic consumption.

\*\*\* [A]t a later time, depending on what the defendant shows, Mr. Antonietti will be permitted either through an adverse examination to probe that subject [with Mr. Wade], assuming then that the doctor has testified in the meantime, indicating that there was an alcohol blood examination tested here and that it revealed that Mr. Wade had a .208 blood alcohol level in his system. And that would indicate under the statute—if the statute is going to be presented here—that a person would be 'under the influence of alcohol.' That's not determinative of the issue whether it influenced him to the extent that he was contributorily negligent when all the facts and circumstances were considered. But the jury should have a right to consider that motion [sic] important evidence.

So the door's open to Mr. Antonietti to inquire into the alcohol subject with the doctor, and once the doctor has indi-

cated the basis for allowing the subsequent drinking to be indicated by Mr. Wade, then I think the predicate has been established by the doctor, and the defense can go into his drinking either directly on a recall of Mr. Wade or through adverse examination during defendant's case in chief." (Emphasis added.)

The City attempted to elicit Harry's blood-alcohol test result in its cross-examination of Dr. Watkins. When the City sought to have Dr. Watkins examine the hospital record in introducing the aspect of Harry's use of alcohol, the latter objected and the following colloquy, in part, took place between court and counsel:

"MR. TINAGLIA: *** I have stipulated to the authenticity of these medical records; and frankly, I'd stipulate probably to the authenticity of all the medical records. I did not stipulate to the truth of any matter asserted here, ***

THE COURT: Are you going to ask him to read that?

MR. ANTONIETTI: Yes, Judge.

THE COURT: Is this going to lead up to alcohol?

MR. ANTONIETTI: Yes, it is. ***

THE COURT: I indicated that I would allow counsel an examination to go into the alcohol aspects. There was no mention on direct about the blood alcohol test that was taken.

MR. TINAGLIA: That's correct, Judge.

THE COURT: Okay. We can either bring this doctor back and have him testify in defendant's case in chief, or we will allow defendant to carve out additional examination at this time.

MR. TINAGLIA: Judge, wait, wait. My understanding is you denied my motion in limine concerning discussion of consumption of alcohol. You did not rule that he would get it in. You ruled that, if he did it correctly, you might let him in. I mean, so I am submitting to you this is not correct.

* * *

THE COURT: For obvious reasons, but I said I would give the defendant on the cross-examination an opportunity to go into that issue and determine what his state was at that time; *** You seek to eliminate any reference to alcohol.

MR. TINAGLIA: True, or have it referred to by good and competent evidence, and that's my objection.

THE COURT: ***

I am allowing the cross-examiner of the doctor to go right into the test information relating to what the blood alcohol test was and whether this doctor is aware of it."