BOATMEN'S NATIONAL BANK OF HILLSBORO, Plaintiff and Counter-defendant-Appellee, v. HOWARD F. WARD, Indiv. and as Trustee, *et al.*, Defendants and Counterplaintiffs-Appellants.

Fifth District   No. 5—91—0169

Opinion filed June 22, 1992.—Rehearing denied July 29, 1992.

Donald W. Jenkins and C. Elizabeth Belmont, both of Vedder, Price, Kaufman & Kammholz, of Chicago, for appellants.

Kelly D. Long, of Kelly D. Long Law Offices, of Hillsboro, and Robert B. Hoemeke and Duane L. Coleman, both of Lewis, Rice & Fingersh, of Clayton, Missouri, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Boatmen's National Bank of Hillsboro (the Bank) filed suit in the circuit court of Montgomery County to foreclose on defendant Howard F. Ward's farm. In his answer, Ward raised as an affirmative defense that the Bank should be estopped by its misconduct from collecting the debt he owed. Based on the same allegations of misconduct, Ward also filed a counterclaim against the Bank for damages. The specific misconduct charged by Ward was that the Bank had breached a fiduciary duty to him. Ward's counterclaim was first tried before the jury, which returned a verdict in his favor in the amount of $248,614.96. The jury also awarded Ward an additional $1 in exemplary damages on the grounds that the Bank's breach of its fiduciary duty was willful and wanton.

Following the jury's verdict, the court ruled that the Bank was still entitled to recover on its foreclosure claim. The court awarded the Bank damages exactly equal to the jury's verdict in favor of Ward, $248,614.96. After receiving additional evidence, the court also awarded the Bank an additional $178,217 to compensate it for the attorney fees it had expended or would be expending in collecting on the debt. As soon as these rulings were made, the court sent the case back to the jury for a determination as to whether Ward was entitled to additional damages on his counterclaim. The jury found that he was and increased his damage award by $300,000.

On September 21, 1990, the circuit court entered judgment on the jury's verdict in favor of Ward on his counterclaim in the amount of $548,615.96, which consisted of the $248,614.96 original compensatory award and the $1 exemplary award plus the jury's $300,000 supplemental award. From this, the court deducted the $248,614.96 which it had awarded to the Bank on its foreclosure suit and the Bank's $178,217 in attorney fees. With this adjustment, Ward was left with a net judgment against the Bank in the

amount of $121,784, and the court ruled that his debt to the Bank was fully satisfied.

Following various post-trial motions, the circuit court affirmed its judgment against Ward on the Bank's foreclosure action, but it found that under the terms of the debt instruments executed by Ward, he could only be held liable for $36,000 of the Bank's attorney fees. It therefore ordered a remittitur of the attorney fee portion of the Bank's judgment against Ward from $178,217 to $36,000. The circuit court also set aside in its entirety the damages awarded to Ward, granting judgment notwithstanding the verdict to the Bank on Ward's counterclaim. Ward now appeals. For the reasons which follow, we reverse the circuit court's judgment and reinstate the jury's verdict with certain modifications.

On this appeal, Ward first argues that the circuit court erred in entering judgment notwithstanding the verdict against him on his counterclaim for breach of fiduciary duty. We agree. In a lengthy and detailed written judgment, the circuit court explained that it had entered judgment notwithstanding the verdict on the counterclaim because, based on its reading of the record, it believed that the jury was simply wrong. In the judge's words, "I believe I am correct and the Jury was in error." This was an improper test.

■ Jury verdicts should not be disturbed on a motion for judgment notwithstanding the verdict merely because the jury could have found differently or because the judge might have found other conclusions to be more reasonable. (*Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 512, 492 N.E.2d 1364, 1365.) A judgment notwithstanding the verdict should be entered only when all of the evidence, when viewed in the light most favorable to the party who prevailed at trial, so overwhelmingly favors the party who lost at trial that no contrary verdict based on that evidence could ever stand. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 139-40, 554 N.E.2d 223, 226.) Where the evidence demonstrates a substantial factual dispute or where the assessment of the witnesses' credibility or the resolution of conflicting evidence may determine the outcome, a court errs in entering judgment notwithstanding the verdict. *Wade v. City of Chicago Heights* (1991), 216 Ill. App. 3d 418, 441-42, 575 N.E.2d 1288, 1304.

Under these criteria, judgment notwithstanding the verdict was improper on the counterclaim for breach of fiduciary duty. The elements of that counterclaim were explained to the jury in an instruction tendered by the Bank. The instruction provided:

"A fiduciary relationship is created where confidence is reposed on one side and resulting superiority and influence is found on the other. In order to establish a fiduciary relationship between Howard F. Ward and [the] Bank, Mr. Ward must show that:

*First,* Howard F. Ward placed trust and confidence in [the] Bank;

*Second,* Howard F. Ward must also show that [the] Bank actually or impliedly, agreed to exercise the Bank's judgment on behalf of Howard F. Ward; and

*Third,* [the] Bank gained influence and superiority over Howard F. Ward.

Factors to be considered in determining whether a fiduciary relationship exists include the degree of kinship, disparity of age, health, mental condition, education and business experience between the parties, and the extent to which the allegedly servient party (Mr. Ward) entrusted the handling of his business and financial affairs to the other ([the] Bank) and reposed faith and confidence in the other.

Once a fiduciary relationship is established, [the Bank] must then show the fairness of the transaction at issue.

If you determine from the evidence that the conduct of the defendant was a breach of this relationship between the parties, you should award as damages the value of whatever you may find him to have gained as a result of this wrong.

If you should further find that the defendant's conduct was willful and wanton, then you may consider in addition an award of punitive damages."

In this case, there was ample evidence from which the jury could have found the existence of a fiduciary duty in accordance with this instruction. The record showed that Ward was a farmer in his sixties whose mental health was in decline. Although he was capable of conducting his personal affairs, his accounting procedures were haphazard. He used what one Bank employee described as "shoe box record keeping." Ward had close and long-standing personal ties to the Bank and many of its key employees. Ward's father was formerly a member of the Bank's board of directors. He had known the Bank's president, Earl Chapin, for 30 years, both in business and socially. He had known the Bank's senior vice-president, David White, for the same length of time. White had worked with Ward's father at the Bank and regarded Ward as a personal friend. So close was the relationship that when Ward became em-

broiled in a custody dispute during his divorce from a previous wife, White offered Ward the Bank's financial assistance to help him keep custody of his son.

Expert testimony adduced by Ward showed that his financial situation deteriorated badly between 1979 and 1983, when the region suffered a serious drought. During this period, Ward came to rely more and more on the Bank to help him manage his financial affairs. Ward had only a ninth-grade education, and he did not even prepare his own financial statements when he needed to to borrow money. He relied on the Bank to do this for him. He evidently came to trust the Bank so much that he would sign the documents it prepared for him without even reading them. According to Tom Justison, the Bank officer who was most heavily involved with Ward beginning in 1983, Ward would simply glance at the documents and sign them. When the Bank suggested that Ward subscribe to an accounting service, he did so. When he became eligible for emergency drought relief loans from the Federal government, the Bank helped him get them.

Evidently, his friends at the Bank were the only ones to whom Ward confided the details of his finances. As his situation worsened, he met with representatives of the Bank incessantly. Justison denied that he ever told Ward how to operate his farm. He admitted, however, that he would give Ward his opinion on various matters when asked, and he was evidently asked a great deal. By Justison's own account, Ward met with him between 25 and 50 times a year between the years 1984 and 1988. As all of this was happening, the Bank was fully aware of Ward's situation and his personal problems, and the extent of his dependency on the Bank was, or should have been, manifest. Yet, the Bank's representatives did nothing to distance themselves from Ward. They made no effort to keep him at arm's length when carrying out business dealings with him. Nor did they ever suggest that he might benefit from independent advice from some third party. Rather, they seemed entirely content for Ward to allow them to exercise their judgment on his behalf.

The trust and confidence Ward placed in the Bank allowed it to gain influence and superiority over him. In the end, he was willing to accept uncritically whatever requirements the Bank imposed so long as he was able to continue his farming operations. Under these circumstances, there was ample support for the jury's conclusion that a fiduciary relationship existed between the Bank and Ward. The Bank cites numerous authorities in an attempt to refute this

conclusion, but in each case the facts are distinguishable from those present here.

In granting judgment notwithstanding the verdict in favor of the Bank on Ward's counterclaim, the circuit court held that even if the Bank did owe a fiduciary duty to Ward, "its conduct toward Ward does not begin to constitute a breach of that duty." This conclusion is also untenable. As the jury instruction quoted above indicates, once a fiduciary relationship between the Bank and Ward was established, the Bank was required to show "the fairness of the transaction at issue." This instruction encapsulated the general proposition that

> "[w]here a fiduciary relationship exists at the time of a transaction whereby the dominant party appears to gain, the transaction is deemed presumptively fraudulent but such presumption is not conclusive and may be rebutted by clear and convincing proof that the dominant party has exercised good faith and had not betrayed the confidence reposed in him [citation]. The burden rests upon the dominant party to produce such evidence. In general, to overcome this presumption of fraud and undue influence the dominant party must show: (1) full disclosure of all relevant information to the subservient party; (2) adequate consideration; (3) competent and independent advice to the principal before completing." *Glass v. Burkett* (1978), 64 Ill. App. 3d 676, 680-81, 381 N.E.2d 821, 824.

In this case, the disputed transaction involved the restructuring of Ward's debt to the Bank in 1984. Prior to this restructuring, Ward's financial situation had degenerated to the point that it no longer supported the amount of credit which had been extended to him by the Bank. The Bank examiners had begun to question the situation, and the Bank, which had previously and repeatedly noted in internal meetings that Ward might be in difficulty, ultimately concluded that it would not extend further credit to him. When Ward was advised of this decision, he became distraught. He recalled at one point breaking down in tears in his barn. He considered filing for bankruptcy but "didn't know who to go to or where to start it." Plaintiff's experts testified that filing bankruptcy was precisely what plaintiff Ward should have done. An independent advisor would have so recommended to Ward, but Justison admitted that he never suggested this as an option.

The jury could have found that the reason Justison did not suggest bankruptcy is that it would have left the Bank with a substan-

tial loss. Not including a life insurance policy payable on Ward's death, the amount of Ward's debt exceeded the amount of security the Bank had by approximately $73,500. The Bank's solution was to obtain more collateral from Ward. The Bank already had a mortgage on 33 acres of pasture owned by Ward and on Ward's undivided one-third interest in an additional 99-acre tract. This original mortgage was cancelled, and a new one was issued on the same property to secure a $100,000 promissory note. The only other real estate Ward had an interest in was a 152-acre parcel of land which had previously belonged to his father. Ward had only a life estate in that property. The remainder was to go to his children. The Bank agreed, however, that if the children would mortgage their interest in the property along with Ward, thereby providing it with an additional $100,000 in security, it would continue to finance Ward so that he could maintain his farming operations.

One of Ward's daughters, Barbara Terneus, apparently obtained legal counsel to advise her on the matter, and she refused to participate in the scheme. A second daughter, Mary Ann Dillon, did agree to sign the mortgage for her father. Before proceeding, Dillon discussed the matter with David White, the senior vice-president at the Bank. White would not tell her how much her father owed. Dillon did not believe that her father should be incurring additional debt, but White told her, "Come on, Mary Ann, all he needs is two good years." White told Dillon that the plan was sound and that she did not need to consult a lawyer. Dillon had previously worked for White's father, and she ultimately signed the mortgage because of her trust in White. She testified that she would not have done so had the request come from someone at the Bank she did not know.

Dillon spoke with her sister Sharon Lohman and endorsed the plan. Lohman testified that she was worried about signing the mortgage. She did not talk with anyone from the Bank before proceeding, and her father would not tell her why he wanted her to sign it. She recalled her conversation with Dillon and stated that Dillon had told her she had talked to David White, who had claimed that it was simply "paper work for the auditors." She also stated that Dillon had told her of White's assurance that "this won't come back on them." After this conversation, Lohman called White directly. Like Dillon, she trusted White. He told her that the mortgage "was just more or less paper work," and that it "wasn't anything to be worried about."

In reality, the evidence showed that this transaction was much more than a question of simple paper work. Ward could not possibly

have resolved his debt problems after "only two good years," as White represented. In fact, the experts agreed that there was no reasonable chance that Ward could ever pay off his debts under the new financing plan. Although the Bank did permit Ward to continue his farming operations for several more years, his farming operations were basically doomed at the time the new plan was implemented. The only real beneficiary under the plan was the Bank. Its previous loss exposure of $73,000 was, after various adjustments were made and the new security was offered, converted to a situation where it had substantially more security than it needed to cover Ward's debt. According to one expert, the new plan was, for Ward's daughters, tantamount to a forfeiture of their interest in the 152-acre parcel.

■ Plaintiff, for his part, made substantial interest payments to the Bank in the years which followed, but he was unable to reduce the principal on either of the two $100,000 notes secured by the mortgages. By the time of trial, his indebtedness to the Bank totaled $248,614.96. By contrast, one of plaintiff's experts testified that had Ward not followed the Bank's plan and had instead filed for bankruptcy, as he should have, he would not only have avoided this debt but would actually have made several hundred thousand dollars. Overall, according to the expert, Ward may have been more than a half a million dollars better off. Under these circumstances, the jury could certainly have found that the Bank failed to sustain its burden of showing that the disputed transaction was fair. With respect to the issue of liability, the circuit court therefore erred in entering judgment notwithstanding the verdict in favor of the Bank on Ward's counterclaim.

In its lengthy order, the circuit court indicated that had the Bank not been entitled to judgment notwithstanding the verdict, it would at least have deserved a new trial on Ward's counterclaim. At no point in the judgment, however, did the court actually make a conditional grant of a new trial in the event its judgment notwithstanding the verdict were reversed. Given the care and detail which the circuit court devoted to its judgment, we do not believe that this omission was inadvertent. Because the circuit court did not enter such a conditional order for a new trial, the question of whether a new trial might have been warranted is not properly before us.

Even if we assumed that the circuit court's judgment could be construed as granting a conditional right to a new trial, that judgment could not stand. The standard of review on an appeal from a trial court's grant of a new trial is whether the trial court abused

its discretion. (*Bishop v. Baz* (1991), 215 Ill. App. 3d 976, 980, 575 N.E.2d 947, 951.) In this case, the circuit court thought that a retrial would be necessary because Tom Justison, one of the Bank's employees, was improperly examined regarding an unrelated case in which he was accused of misconduct in the handling of a Bank customer's affairs. As it turns out, that case had been vacated, a fact which Ward's counsel overlooked. We do not believe, however, that counsel's error was any basis for a new trial. References to the vacated case were brief, and the Bank did not even raise a contemporaneous objection the first time that the case was mentioned. We note, moreover, that when it was eventually discovered that the judgment had been vacated, the court issued a strong admonition to the jury to disregard it. The record in this case is voluminous, and after having studied it carefully, we are at a loss to understand how this one incident could have had any real impact on the jury's verdict. The error was harmless and cannot serve as the predicate for a new trial.

In referring to the possibility of a new trial, the circuit court also opined that one of Ward's experts should not have been allowed to give her opinions as to Ward's damages. The circuit court's particular objections warrant no protracted discussion. We think it sufficient to say that those objections go to the weight of the expert's testimony and not to its admissibility. The Bank had ample opportunity to cross-examine the expert and availed itself of that opportunity. It was for the jury to consider the significance of the expert's opinions and the validity of her conclusions, and it made that decision. The court has no right to usurp the jury's decision simply because it would have decided the matter differently. Yet, that is precisely what would be happening if a new trial were granted here. No new trial should have been granted. The jury's verdict in favor of Ward on his counterclaim for breach of fiduciary duty must be reinstated.

■ Having concluded that the circuit court should not have set aside the jury's verdict in favor of Ward on his counterclaim for breach of fiduciary duty, we also find that the circuit court erred in entering judgment in favor of the Bank on its foreclosure action. As indicated at the outset of our discussion, Ward raised as an affirmative defense to the foreclosure the same breach of fiduciary duty which gave rise to his counterclaim. Specifically, Ward contended that the Bank's breach of fiduciary duty should estop it from attempting "to collect on any or all of its notes, mortgages or security agreements [with Ward]." Although we have found no Illi-

nois authority directly on point, the parties have not disputed the validity of such a defense. Nor have they disputed that, if established, the defense would be complete. Both the promissory notes and the mortgages by which they were secured would be rendered unenforceable.

The questions of whether the Bank owed a fiduciary duty to Ward and whether that fiduciary duty was breached were thus common and fundamental to both the counterclaim and the affirmative defense. There is no dispute that the counterclaim was an action at law, while the foreclosure was equitable in nature. This did not, however, give the circuit court the right to make a finding on the question of breach of fiduciary duty independent of that made by the jury. Where, as here, legal and equitable proceedings are tried together, the jury's verdict governs factual issues common to them. In the Federal courts, this rule is compelled by the need to protect a litigant's right to a jury trial under the seventh amendment to the United States Constitution (U.S. Const., amend. VII). (*Williamson v. Handy Button Machine Co.* (7th Cir. 1987), 817 F.2d 1290, 1293-94.) Although the seventh amendment does not apply to State court proceedings (*Hattaway v. McMillan* (11th Cir. 1990), 903 F.2d 1440, 1451 n.16), our State has its own constitutional guarantee of the right of trial by jury (Ill. Const. 1970, art. I, §13), and we believe that it compels the same conclusion. Accordingly, we believe that the circuit court erred when it disregarded the jury's verdict and proceeded to decide the fiduciary duty question independently. We must therefore also reverse the circuit court to the extent that it entered judgment in favor of the Bank on its complaint for foreclosure.

On the foreclosure claims, judgment shall be entered in favor of Ward. Because there can now be no foreclosure against Ward, Ward will not, of course, sustain any additional damages, such as attorney fees, on account of such a foreclosure. The factual predicate for the jury's award of an additional $300,000 during the second phase of its deliberations has been eliminated. Thus, while we are reinstating the jury's verdict in favor of Ward on his counterclaim, the amount of the judgment will be limited to the jury's initial determination of $248,614.96 in compensatory damages and $1 in punitive damages.

In its judgment, the circuit court opined that it would "be wholly unconscionable" to allow the jury's damage award to stand, while at the same time barring the Bank from foreclosing on its mortgages or otherwise collecting on its promissory notes. We disagree. Allowing Ward to keep his land, avoid the promissory notes,

and recover damages would put him in a better position than he was in prior to the Bank's wrongful conduct. As we have previously indicated, however, had Ward declared bankruptcy as he should have, instead of throwing in more collateral and adding to his debt load, he would have been more than a half a million dollars better off than he was at the time of trial, taking into account both the money he would have earned and the debt he would have avoided. We note, moreover, that Ward ended up paying well over $100,000 in interest on his debt obligations, and that even after he receives his damage award and his property free from debt, he will still owe nearly $50,000 to the Federal government on the FmHA loan which was obtained in connection with the Bank's 1984 restructuring plan. In addition, there was evidence that the financial strain Ward experienced as a result of having to operate under a plan which was essentially unworkable contributed, at least in part, to the deterioration of his mental health, culminating in a suicide attempt.

For the foregoing reasons, the judgment of the circuit court of Montgomery County is reversed. Pursuant to our authority under Supreme Court Rule 366 (134 Ill. 2d R. 366), we hereby enter judgment in favor of Ward and against the Bank on the Bank's complaint for foreclosure. We reinstate the jury's verdict in favor of Ward and against the Bank on Ward's counterclaim for breach of fiduciary duty, and we enter judgment on that verdict in the amount of $248,614.96 in compensatory and $1 in punitive damages.

Before ending our discussion, there is one final administrative matter we must address. The Bank's original foreclosure action named Mary Ann Dillon and Sharon Lohman as defendants. The circuit court dismissed those defendants from the case. Thereafter, it dismissed separate counterclaims Lohman and Dillon had filed against the Bank. Lohman and Dillon originally appealed the dismissal of their counterclaims, but after joining in Ward's notice of appeal, they took no further steps to prosecute their appeals. They filed no briefs and did not appear or even request oral argument. On the Bank's motion, their appeals are hereby dismissed.

Reversed; verdict reinstated, judgments entered; motion to dismiss appellants Mary Ann Dillon and Sharon Lohman granted.

RARICK and H. LEWIS, JJ., concur.